**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE TRANSWEST RESORT PROPERTIES, INC., *Debtor*, | No. 12-17176 |
| | D.C. Nos. 4:12-cv-00024-RCC 4:12-cv-00121-RCC |
| JPMCC 2007-C1 GRASSLAWN LODGING, LLC, *Appellant*, | |
| v. | OPINION |
| TRANSWEST RESORT PROPERTIES INCORPORATED; SOUTHWEST VALUE PARTNERS FUND XV LLP; SWVP LA PALOMA LLC; SWVP HILTON HEAD LLC, *Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, Chief District Judge, Presiding

Argued and Submitted
January 13, 2015—San Francisco, California

Filed July 1, 2015

Before: J. Clifford Wallace, Milan D. Smith, Jr.,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland;
Dissent by Judge Milan D. Smith, Jr.

---

### SUMMARY[*]

---

### Bankruptcy

The panel reversed the district court's decision dismissing on equitable mootness grounds an appeal from the bankruptcy court's order confirming a Chapter 11 plan of reorganization.

The panel held that even though the plan had been implemented, a lender's colorable objections to the plan were not equitably moot because the lender had diligently sought a stay, and it would be possible to devise an equitable remedy to at least partially address the lender's objections without unfairly impacting third parties or entirely unraveling the plan. The panel remanded the case for further proceedings.

Dissenting, Judge M. Smith wrote that the district court's decision should be affirmed because the remedies the lender proposed would be grossly inequitable to a third-party investor and would surely jeopardize the reorganization.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

David M. Neff (argued) and Eric E. Walker, Perkins Coie LLP, Chicago, Illinois, for Appellant.

Susan G. Boswell (argued), Quarles & Brady LLP, Tucson, Arizona; Kasey C. Nye, Mesch, Clark & Rothschild, Tucson, Arizona; E. King Poor, Quarles & Brady LLP, Chicago, Illinois, for Appellees.

**OPINION**

FRIEDLAND, Circuit Judge:

We consider whether a lender that made colorable objections to a plan of reorganization in bankruptcy court and then diligently sought a stay in order to litigate those objections may obtain review of its objections on appeal even though the plan has been implemented. Because it would be possible to devise an equitable remedy to at least partially address the lender's objections without unfairly impacting third parties or entirely unraveling the plan, we hold that the lender's objections are not equitably moot and should be considered on appeal. We thus reverse the district court's decision dismissing the appeal on equitable mootness grounds and remand for further proceedings.

**I.**

**A.  Background**

In 2007, five related entities acquired the Westin Hilton Head Resort and Spa and the Westin La Paloma Resort and

Country Club. The five entities (collectively "Debtors") were: Transwest Hilton Head Property, LLC, and Transwest Tucson Property, LLC (collectively "Operating Debtors"); Transwest Hilton Head II, LLC, and Transwest Tucson II, LLC (collectively "Mezzanine Debtors"); and Transwest Resort Properties, Inc. ("Holding Company Debtor"). The Holding Company Debtor was the sole owner of each of the Mezzanine Debtors. The Mezzanine Debtors, in turn, were each the sole owners of the Operating Debtors, which owned and operated the respective hotels.

The 2007 acquisition of the hotels was financed by two loans: first, a $209 million loan to the Operating Debtors secured by liens on the two hotels (the "mortgage loan"); and, second, a $21.5 million loan to the Mezzanine Debtors secured by liens on the ownership interests in the Operating Debtors (the "mezzanine loan").

The Mezzanine Debtors and the Operating Debtors defaulted on the mezzanine and mortgage loans, respectively. In 2010, all five Debtors filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Arizona. The bankruptcy cases for the five entities were jointly administered.

JPMCC 2007-C1 Grasslawn Lodging, LLC ("Lender"), which had acquired the mortgage loan before the Debtors filed for bankruptcy, filed a proof of claim in the bankruptcy proceeding for $299 million.[1] PIM Ashford Subsidiary I

---

[1] The amount of the claim consisted of the principal amount of the mortgage loan ($209 million) plus interest, fees, and premiums. The bankruptcy court then disallowed the premiums and reduced the amount to approximately $247 million.

LLC, which had acquired the mezzanine loan in 2008, filed two proofs of claim totaling $39 million.[2]  Debtors and Lender stipulated that the value of the two hotels was $92 million.

## B. Plan of Reorganization

Debtors filed a joint plan of reorganization.  The plan proposed to cancel the Mezzanine Debtors' equity interest in the Operating Debtors and to dissolve the Mezzanine Debtors.  Southwest Value Partners Fund XV, LP ("SWVP") would invest no less than $30 million and would become the new sole owner of the Operating Debtors.

Pursuant to 11 U.S.C. § 1111(b)(2), Lender elected to have its entire allowed claim, $247 million, treated as a secured claim.[3]  The plan proposed to reinstate the loan, but to restructure the repayment requirements to comprise monthly interest-only payments and then a balloon payment of the remaining loan amount after 21 years.

The proposed restructured loan terms also included a due-on-sale clause.  Pursuant to the clause, any sale or refinancing of the hotels would make the entire remainder of the $247 million loan due immediately.  The clause contained an

[2] The amount of the claims consisted of the principal amount of the mezzanine loan ($21.5 million) plus interest, late fees, and $10 million the Mezzanine Debtors were required to pay back because they failed to make certain promised improvements.

[3] If Lender had not made the § 1111(b) election, then its claim would have been bifurcated into (1) a secured claim equal to the value of the collateral ($92 million) and (2) an unsecured claim for the remainder. *See* 11 U.S.C. § 506(a)(1).

exception, however: between years five and fifteen of the loan, the hotels could be sold or refinanced subject to the restructured loan (meaning the new buyer would take on the loan obligations), without the full amount of the loan coming due on sale, as long as certain conditions were met.[4]

PIM Ashford's treatment under the reorganization depended on whether it voted for the plan. If it voted against the plan, it would not receive any distributions. If it voted for the plan, PIM Ashford would be entitled to a small percentage of surplus cash flow in the future. The plan extinguished the mezzanine loan's collateral (the Mezzanine Debtors' equity interest in the Operating Debtors).

There were ten classes of claims under the plan.[5] The mortgage loan and the mezzanine loan were each in a class by themselves. After the plan was proposed, Lender acquired the mezzanine loan from PIM Ashford. Lender then voted both its positions (its original claim and the claim it obtained from PIM Ashford) against the plan.

---

[4] The original loan agreement between Operating Debtors and Lender also contained restrictions on the ability to sell the properties.

[5] In bankruptcy reorganizations, claims against the debtor are grouped into classes according to their rights vis-à-vis the debtor. *See* 11 U.S.C. § 1122; 7 Collier on Bankruptcy ¶ 1122.01 (16th ed. 2012) ("Section 1122 . . . provides a plan proponent with an important tool in aid of confirmation of a plan—namely, the ability to classify substantially similar claims in the same class for purposes of voting and treatment."). A class accepts the plan when at least two-thirds in amount and more than one-half in number of the claims in the class vote in favor. 11 U.S.C. § 1126(c). Generally, for a plan to be confirmed, every class must either vote in favor of the plan or receive full payment. *See id.* § 1129(a)(8); *but see id.* § 1129(b) (setting forth an exception to this rule, for confirmation of nonconsensual cram down plans).

The plan was confirmed despite the votes of Lender's two dissenting classes because the plan satisfied the "cram down" requirements of § 1129(b).**[6]**   Pursuant to the plan, the restructured mortgage loan entitled the Lender to deferred cash payments (1) totaling at least the amount of the allowed claim ($247 million, or the "total loan amount"), and (2) having a net present value equal to the value of the collateral ($92 million).   11 U.S.C. § 1129(b)(2)(A)(i)(II). Lender also retained a lien on the hotels for the total loan amount.  *Id.* § 1129(b)(2)(A)(i)(I).

## C.  Lender's Two Objections to the Plan

Lender objected to two aspects of the plan.  First, Lender contended that the ten-year exception to the due-on-sale clause should be removed because it negated its § 1111(b) election.  According to Lender, the option to keep the entire loan amount as a secured claim, codified in § 1111(b), was intended by Congress to protect secured creditors against the undervaluation of their collateral.  If the collateral for a loan were undervalued, Lender argued, the due-on-sale clause would protect the lender's interests by, for example, preventing the debtor from immediately selling the collateral subject to the restructured loan and capturing the true value

---

**[6]** The Bankruptcy Code allows a plan proponent to confirm—or "cram down"—a plan over the dissent of a class as long as certain requirements for nonconsensual confirmation are met.  *See* 11 U.S.C. § 1129(b); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2069 (2012) ("Section 1129(b) creates an exception to that general rule, permitting confirmation of nonconsensual plans—commonly known as 'cramdown' plans—if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

of the collateral.[7]   Here, Lender specifically asserted that the exception to the due-on-sale clause between years five and fifteen would allow SWVP to unfairly negate at least part of the benefit of Lender's § 1111(b) election.

Second, Lender complained that the bankruptcy court misapplied one of the plan-confirmation requirements.

---

[7] Lender cites to the following treatise passage to support its argument that the sale of the hotels subject to the restructured loan would undermine its § 1111(b) election:

> Assume a debtor with a first mortgage debt of $10,000,000. At the time of the bankruptcy petition the court determines that the value of the mortgage real estate is $7,500,000 . . . . Assume . . . that our creditor makes the [§ 1111(b)] election and so is left after confirmation with a $10,000,000 mortgage. Just as he predicted, real estate values reverse themselves and the debtor makes an agreement to sell the property for $12,000,000 to a third party. When the creditor appears at the closing to receive its $10,000,000, the debtor says: "Not so fast. I have sold the property subject to the mortgage. You will continue to get your payments because my purchaser has assumed the mortgage and I remain liable on it, but the only cash available is the $2,000,000 above the $10,000,000 and that goes to me." To make section 1111(b)(2) even remotely fair, this sort of activity should be prohibited. Surely the policy behind section 1111(b)(2) demands that the court infer a "due on sale" clause in any such mortgage whether one exists or not.

David G. Epstein et al., Bankruptcy § 10-27, at 776, 778 (1993). In this case, sale of the hotels subject to a due-on-sale clause would entitle Lender to immediate payment of the remainder of the total loan amount. If the sale occurred during the exception to the due-on-sale clause, however, Lender would continue to receive only a stream of payments with a net present value lower than the total loan amount.

Section 1129(a)(10) requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must have] accepted the plan" for it to be confirmed. 11 U.S.C. § 1129(a)(10). Lender pointed out that in cases involving multiple debtors, courts have split on whether § 1129(a)(10)'s requirement applies per plan or per debtor. *Compare, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 180–84 (Bankr. D. Del 2011) (per debtor), *with JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 264–66 (Bankr. S.D.N.Y 2009) (per plan). Lender argued for the per-debtor interpretation of § 1129(a)(10). Because the Mezzanine Debtors here did not have any impaired class of creditors voting for the plan, Lender argued that, under this interpretation, the plan violated § 1129(a)(10).

The bankruptcy court overruled Lender's two objections and confirmed the plan.

## D. Post-confirmation Proceedings

Four days after the bankruptcy court confirmed the plan, Lender filed a notice of appeal.[8] On the same day, Lender filed a motion in the bankruptcy court requesting that the consummation of the plan be stayed pending appeal. Lender argued that failure to grant the stay could result in the appeal

---

[8] Appeals from bankruptcy courts in this circuit may be heard in the first instance by either a district court or the Ninth Circuit's bankruptcy appellate panel ("BAP"). *See* 28 U.S.C. § 158(a)–(b). Lender's appeal was initially referred to the BAP, but Debtors and SWVP exercised their right to object to proceeding before the BAP, so the appeal was heard by the district court. *See id.* § 158(c)(1). A party seeking review of a decision from the district court or the BAP may appeal to this court, *id.* § 158(d), as Lender did here.

being rendered moot. Debtors and SWVP each filed objections to the stay request, arguing that Lender had not shown how substantial consummation of the plan would moot Lender's appeal. The bankruptcy court denied Lender's motion for a stay and—having apparently accepted Debtor's and SWVP's arguments—ruled that Lender had not shown the likelihood of irreparable harm required for a stay because the possibility of mootness was "speculative, at best." Lender then filed an identical stay motion in the district court, and Debtor and SWVP again opposed it. Like the bankruptcy court, the district court declined to issue a stay.

When the district court then considered the appeal—which advanced Lender's two objections to the plan—it held that the appeal was equitably moot. Although the district court acknowledged that Lender had been diligent in seeking a stay, it stated that the plan had been consummated, third parties had relied on the confirmation of the plan, and the relief sought would be inequitable.

Lender filed this timely appeal from that decision.

## II.

Equitable mootness is a prudential doctrine by which a court elects not to reach the merits of a bankruptcy appeal. *Rev Op Grp. v. ML Manager LLC* (*In re Mortgs. Ltd.*) ("*Mortgages I*"), 771 F.3d 1211, 1215 n.2 (9th Cir. 2014). "An appeal is equitably moot if the case presents transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *Id.* at 1215 (alteration omitted). Unlike Article III mootness, which causes federal courts to lack jurisdiction and so to have an *inability* to provide relief,

equitable mootness is a judge-created doctrine that reflects an *unwillingness* to provide relief. *Id.*[9]

We have set out four considerations to help determine whether an appeal is equitably moot:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d 869, 881 (9th Cir. 2012). Because each of Lender's objections would require a separate form of relief, the equitable mootness analysis must be applied separately to each objection. *See Rev Op Grp. v. ML Manager LLC* (*In re Mortgs. Ltd.*) ("*Mortgages II*"), 771 F.3d 623, 628 (9th Cir. 2014).

---

[9] The doctrine of equitable mootness is not without its critics. *See, e.g.*, *In re Cont'l Airlines*, 91 F.3d 553, 567–73 (3d Cir. 1996) (in banc) (Alito, J., dissenting) (questioning the legal basis for equitable mootness).

In evaluating a dismissal on equitable mootness grounds, we review factual findings for clear error and legal conclusions de novo.  *See Mortgages I*, 771 F.3d at 1214.

## A.

Courts must be cautious in applying equitable mootness when a party has been diligent about seeking a stay. *Mortgages II*, 771 F.3d at 628.  "To say that a party's claims, although diligently pursued, are equitably moot because of the passage of time, before the party had a chance to present views on appeal, would alter the doctrine to be one of 'inequitable mootness.' . . . [I]t would be inequitable to dismiss their appeal on equitable mootness grounds merely because the reorganization has proceeded."  *In re Thorpe*, 677 F.3d at 881.

*Mortgages I* and *Mortgages II* together highlight the importance of diligence in the equitable mootness analysis. In *Mortgages I*, the appellant had failed to seek a stay while pursuing an appeal.  771 F.3d at 1214.  That the appellant had sat on its rights weighed heavily in favor of holding the appeal equitably moot.  *Id.* at 1217.  In *Mortgages II*, by contrast, the appellant had sought a stay pending the appeal. 771 F.3d at 627.  We held that the appeal was not equitably moot and, in doing so, specifically emphasized the request for a stay as a factor differentiating it from *Mortgages I*.  *See Mortgages II*, 771 F.3d at 629 ("Unlike in [*Mortgages I*], [appellant] diligently pursued its rights by seeking a stay of the Declaratory Judgment Order, even though it was unable to obtain the stay.").

Here, Lender was diligent about seeking appellate review of its two objections to the plan.  Four days after the

bankruptcy court confirmed the plan, Lender filed a notice of appeal and asked the bankruptcy court to stay the consummation of the plan. When the bankruptcy court denied that motion, Lender sought a stay from the district court. That Lender was diligent here cuts strongly in favor of appellate review of Lender's claims. *See Mortgages II*, 771 F.3d at 628 ("[W]e are cautious about not giving a party who is diligent . . . an opportunity to present its appeal.").

**B.**

The next consideration in the test for equitable mootness is "whether substantial consummation of the plan has occurred." *In re Thorpe*, 677 F.3d at 882; *see also Mortgages II*, 771 F.3d at 628–29. The term "substantial consummation" is defined in the Bankruptcy Code as:

> (A)    transfer of all or substantially all of the property proposed by the plan to be transferred;

> (B)    assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

> (C)    commencement of distribution under the plan.

11 U.S.C. § 1101(2).

As Lender does not dispute, the record indicates that the plan has been substantially consummated. SWVP assumed

control over the Operating Debtors. SWVP then reorganized the Debtors by, among other things, extinguishing Mezzanine Debtors' equity interests in Operating Debtors. Finally, SWVP funded accounts necessary to make disbursements under the plan and assumed contracts in order to run the hotels.

SWVP and Debtors[10] argue that substantial consummation creates a presumption that the appeal is moot. To support this proposition, they cite to a series of out-of-circuit cases. *See* Appellees' Br. 32 (citing*, e.g.*, *Aetna Cas. & Sur. Co. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 94 F.3d 772, 776 (2d Cir. 1996)). Our circuit's articulation of the equitable mootness test, however, has never included such a presumption. *See Mortgages II*, 771 F.3d at 629 ("Substantial consummation of a bankruptcy plan often brings with it a comprehensive change in circumstances that renders appellate review of the merits of the plan impractical. But this is not always the case. . . . We must still consider whether, despite substantial consummation, we can fashion effective relief. To do so, we analyze the final two factors from *Thorpe*.") (citations omitted); *see also In re Thorpe*, 677 F.3d at 882 n.7. Although substantial consummation is a factor weighing in favor of finding the appeal moot, the law in this circuit requires that we still look at the third and fourth prongs of the equitable mootness test.

---

[10] We continue to use the term "Debtors" despite the fact that the Mezzanine Debtors had been dissolved by the time the appeal in this court was filed.

## C.

The third consideration in the test for equitable mootness is whether the relief sought would bear unduly on innocent third parties. *In re Thorpe*, 677 F.3d at 882; *Mortgages II*, 771 F.3d at 629. To evaluate this, we must ask "whether it is possible to [alter the plan] in a way that does not affect third party interests to such an extent that the change is inequitable." *In re Thorpe*, 677 F.3d at 882. Third parties' reliance on the consummation of the plan is not enough to find this prong satisfied. Rather, for this factor to weigh in favor of holding a party's appeal to be equitably moot, the specific relief sought must bear unduly on innocent third parties. *See id.*

We analyze each of Lender's objections in turn.

## 1. The Exception to the Due-on-Sale Clause

Lender argued that the plan's exception to the due-on-sale clause negates its § 1111(b) election. If Lender prevailed on the merits of this argument, Lender's proposed relief would be the elimination of the exception to the due-on-sale clause. Without the exception, the due-on-sale clause would prevent SWVP from selling or refinancing the hotels without paying Lender the remainder of the total loan amount.

The relief requested by Lender affects only the division between Lender and SWVP of any appreciation in value of the hotels (or from any inaccurately low valuation of the hotels during the bankruptcy proceeding). No party other than Lender and SWVP would be affected by this division.

The question therefore is whether SWVP is the type of innocent third party that the equitable mootness doctrine is meant to protect. In light of SWVP's participation at every stage of these proceedings, the answer is no. SWVP became involved in the reorganization as a new investor and as the proposed owner of the reorganized entity before the confirmation of the plan. Although Debtors put forward the initial version of the plan, SWVP participated in the hearings held by the bankruptcy court regarding confirmation of the plan, and the bankruptcy court acknowledged that it considered SWVP's pleadings in reaching its decision to confirm the plan. In fact, SWVP negotiated with Lender over the final form of the confirmation order (in other words, the final version of the plan), including the portions that gave rise to Lender's objections.[11]

Following confirmation of the plan, SWVP participated in further proceedings in the bankruptcy and district courts. When Lender sought a stay pending appeal, SWVP filed objections in both courts, arguing, among other things, that Lender's objections to the plan were meritless. SWVP is now also a party to this appeal.[12]

---

[11] The dissent ignores the role that SWVP had in negotiating the final confirmation order. SWVP and Lender negotiated numerous aspects of the plan documents. Ultimately, they were not able to agree on two issues—the subjects of the two objections to the plan that Lender then challenged on appeal. SWVP chose to go forward with the confirmation process despite its awareness of Lender's objections.

[12] Appellees' assertion that "SWVP is not a party to this appeal," Appellees' Br. 37, is somewhat baffling. SWVP is one of the Appellees. Although Appellees Corporate Disclosure Statement in their brief (inexplicably) fails to name SWVP itself, it does disclose SWVP LP-HH, LLC, which is wholly owned by SWVP, as a parent company of some of the Appellees.

In *Thorpe*, we explained that, in evaluating the third prong of the equitable mootness test, "[a]n important consideration is whether all the parties affected by the appeal are before the court." *In re Thorpe*, 677 F.3d at 882. Our review of the procedural history of this case shows that SWVP has been involved in the plan confirmation and appeal at every level, so it is not an innocent third party. Moreover, when a sophisticated investor such as SWVP helps craft a reorganization plan that "press[es] the limits" of the bankruptcy laws, appellate consequences are a foreseeable result. *Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 244 (5thCir. 2009).[13]

---

[13] The dissent warns that, by saying that SWVP is not an innocent third party, we risk reducing the amount investors will be willing to pay for reorganized entities. Yet, if we allow SWVP to stick to a plan that may violate the Bankruptcy Code and prevent Lender from arguing its objections on appeal, we risk decreasing potential lenders' incentives to make loans in the first place. The Fifth Circuit in *Pacific Lumber* aptly warned that "[a]pplying equitable mootness too broadly to disfavor appeals challenging the treatment of secured debt carries a price. It may promote the confirmation of reorganization plans, but it also destabilizes the credit market for financially troubled companies." 584 F.3d at 244 n.19.

Moreover, investors involved in the reorganization process have substantial control over the risk that a plan will be revised due to an appeal. Here, for example, SWVP could have continued negotiating a resolution of Lender's objections before the parties agreed to the final confirmation order, or SWVP could have declined to participate in the plan given that Lender's objections remained outstanding. *See supra* note 11.

**2.  Section 1129(a)(10)'s Accepting-Class Requirement**

Lender suggests that there would be two possible remedies if it prevailed on appeal on its argument that § 1129(a)(10)'s requirement should be applied to each Debtor.  First, Lender argues that it could be compensated for the plan's having extinguished the collateral of its mezzanine loan.  Second, Lender argues that the liens on the ownership interest in the Operating Debtors could be reinstated.

Debtor has not shown how either of these proposed forms of relief would affect innocent third parties.  Instead, Debtor's arguments focus on the effect that allowing the appeal to go forward would have on SWVP.  The two forms of relief sought—distribution of money from SWVP to Lender or reinstatement of Lender's liens—would alter only the relationship between SWVP and Lender.  *See, e.g.*, *Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25, 34 (B.A.P. 9th Cir. 2008) (finding that reinstatement of a lien would not affect third parties).  As explained in the previous section, SWVP's involvement in the reorganization process means it is not the type of innocent third party the third prong of the equitable mootness test is meant to protect.

**D.**

The fourth, and most important, consideration in the equitable mootness test is whether the bankruptcy court could fashion equitable relief without completely undoing the plan. *See Mortgages II*, 771 F.3d at 629; *In re Thorpe*, 677 F.3d at 883.  Even if the relief would be only partial, "[w]here equitable relief, though incomplete, is available, the appeal is not moot."  *In re Thorpe*, 677 F.3d at 883.

## 1.   The Exception to the Due-on-Sale Clause

Lender seeks elimination of the exception to the due-on-sale clause.  Lender's argument in support is that allowing a sale of the hotels subject to the restructured loan frustrates the intended purpose of the § 1111(b) election.  We need not and should not consider the merits of that argument given that our present task is only to determine whether equitable mootness prevents the district court from considering the argument at all.  It is sufficient for now to understand that, if Lender succeeded on the merits of this argument, eliminating the exception to the due-on-sale clause would give Lender complete relief.

Even if Lender were successful on the merits, however, the potential options for relief would not necessarily be limited to eliminating the full exception.  Because even incomplete relief can be enough to counsel against mooting the appeal, *see Mortgages II*, 771 F.3d at 629, we have to ask whether there are any forms of even partial relief that could be provided without unravelling the plan.  We can think of two examples of potential partial relief.  First, the bankruptcy court could reduce the length of the window during which the due-on-sale clause does not apply.  Second, the court could decide that, if a sale occurred during the window, Lender would be entitled to some percentage of the difference between the remainder of the total loan amount and the loan's present value.

SWVP and Debtors insist that any relief would be inequitable.  Their position implies that were the court to narrow the window of the exception by one day—or, in the case of a sale during the period of the exception, to award Lender one percent of the difference between the remainder

of the total loan amount and the loan's present value—that would undermine the entire plan. We see no reason why this would be true, and SWVP and Debtors have offered none.[14]

---

[14] The dissent delves into the merits of Lender's objection, arguing that Lender is asking for more than it had pre-bankruptcy, that providing the precise form of relief Lender has requested would be inequitable, and that the requested relief might even cause SWVP to divest from the hotels. Perhaps these are arguments that could persuade the bankruptcy court on remand from an appellate victory by Lender on the merits. But our task at this juncture is merely to determine whether, if Lender succeeded on the merits, an equitable remedy could be fashioned. The dissent disputes our conclusion that a remedy could be fashioned, questioning whether the bankruptcy court could require SWVP to pay lender anything. But SWVP is a party to this appeal. We previously have held that a party to an appeal of a bankruptcy plan may be required to make payments despite prior confirmation of the plan. *See Salomon v. Logan* (*In re Int'l Envtl. Dynamics, Inc.*), 718 F.2d 322, 326 (9th Cir. 1983) ("Because Logan is a party to this appeal, this court could fashion effective relief by remanding with instructions to the bankruptcy court to order the return of erroneously disbursed funds."); *see also Spirtos v. Moreno* (*In re Spirtos*), 992 F.2d 1004, 1007 (9th Cir. 1993) ("We can fashion effective relief by ordering Debtor, who is a party to this appeal, to return the money to the estate."). Here, a remedy that did require a transfer of funds from SWVP could be accomplished by changing the amount eventually due on the loan rather than requiring a separate cash-transfer event. Moreover, reducing the length of the exception to the due on sale clause would not require a transfer of funds at all. Again, the existence of *some* remedy is all that is required for the case not to be equitably moot.

We also disagree with the dissent's suggestion that a nominal remedy will always be available, preventing any case from being equitably moot. When true third parties have acted in reliance on a plan, there may be instances in which any plan amendment would unfairly undermine that reliance. *See, e.g.*, *In re Pac. Lumber*, 584 F.3d at 251 ("[W]e must hold [the lender's] impairment and classification contentions equitably moot. Because the plan has been substantially consummated, the smaller unsecured creditors—irrespective of their status vis à vis the reorganized companies—have received payment for their claims. Third-party

Additionally, SWVP and Debtors' present contention that altering the exception to the due-on-sale clause would unravel the economics of the plan is in tension with the positions they took before the bankruptcy and district courts. SWVP and Debtors both actively opposed the stay sought by Lender in the bankruptcy and district courts, arguing that there would be no likelihood of irreparable harm absent a stay. In doing so, SWVP specifically stated that Lender had not demonstrated how "substantial consummation of the Confirmed Plan would, in fact, moot its appeal." Debtors argued that there would be no "immediate harm" from the plan's exception to the due-on-sale clause because the exception would not arise until "approximately January 2017," and that "[i]t [wa]s entirely speculative whether such a sale would ever occur." These prior positions severely undermine SWVP and Debtor's argument before this court that the exception to the due-on-sale clause was a fundamental component of the transaction and that it cannot now be eliminated or altered without unraveling the plan.

## 2.  Section 1129(a)(10)'s Accepting-Class Requirement

Section 1129(a)(10) requires that, in order to confirm a plan, at least one impaired class of claims must vote in favor of the plan. Lender's second objection was that § 1129(a)(10)'s requirement that there be an impaired class voting for the plan should apply to each individual debtor, not to the plan as a whole. Because Lender, in its position as the sole creditor of the Mezzanine Debtors, voted against the plan, Lender argued that this requirement was not satisfied here.

---

expectations cannot reasonably be undone, and no remedy for [the lender's] contentions is practicable other than unwinding the plan.").

If Lender succeeded on the merits of this argument, it would have shown that, under the Bankruptcy Code, it had the right to veto the plan at the confirmation stage.[15] Even if we assume that vetoing the entire plan is no longer an available form of relief, though, we must again ask whether there is any other remedy that could be crafted to address Lender's claim.

Logically, the value of Lender's ability to veto was worth somewhere between nothing and $39 million—the total value of Lender's claims against the Mezzanine Debtors. Under 11 U.S.C. § 1126(f), a class of claims that is not impaired (meaning the plan does not alter its rights) is deemed to automatically accept the plan. Accordingly, if Lender's mezzanine claim had been paid in full, the mezzanine claim would have been deemed to have voted for the plan. Making that payment now (or, at least, that payment plus interest) would thus seem to eliminate the § 1129(a)(10) objection. A lesser payment may not eliminate the § 1129(a)(10) objection altogether, but would at least offer a partial remedy. And we see no reason why, if the court were to devise a remedy that required SWVP to pay Lender one dollar, for example, the plan would be undone. *See In re Thorpe*, 677 F.3d at 883 (holding that equitable remedies "vest great discretion in a court devising a remedy").

---

[15] To the extent that SWVP argues that Lender was acting in bad faith by acquiring the mezzanine loan to improve its leverage in negotiations about the mortgage loan, that argument was already litigated before the bankruptcy court. Debtors filed a motion arguing that Lender had acquired the mezzanine loan in bad faith and that the court should therefore designate Lender pursuant to 11 U.S.C. § 1126(e). (In this context, designate means disqualify from voting.) The bankruptcy court denied Debtors' motion. SWVP could have filed a cross appeal in the district court to contest that ruling but did not.

* * *

We conclude that Lender's appeal is not equitably moot. Although the plan has been substantially consummated, Lender was diligent about seeking a stay, and it would be possible to devise an equitable remedy for each objection that would not bear unduly on innocent third parties.

## III.

For the foregoing reasons, we **REVERSE** the district court's dismissal for equitable mootness and **REMAND** for further proceedings.

M. SMITH, Circuit Judge, dissenting:

I respectfully dissent.

The majority wrongly concludes that the interests of Southwest Value Partners (SWVP), a third-party investor with no pre-petition interest in this bankruptcy, should not inform our assessment of whether it would be prudent or equitable to disturb this reorganization plan at this late stage. It is only by ignoring these interests that the majority is able to conclude that any equitable remedies would be available in this case. In reality, the remedies the Lender proposes are grossly inequitable to SWVP and would surely jeopardize the reorganization. More broadly, the majority's decision discourages potential investors from relying on the finality of bankruptcy court confirmation orders, or from investing in struggling properties until all bankruptcy litigation is concluded, which, as in this case, can take many years. This

impedes the Bankruptcy Code's goal of "maximizing debtors' estates and facilitating successful reorganization," to the detriment of both debtors and creditors. *In re Continental Airlines*, 91 F.3d 553, 565 (3d Cir. 1996).

The majority and I agree that this plan has been substantially consummated, and that this factor weighs in favor of finding this appeal equitably moot. We disagree, however, regarding just how much weight the factor should carry. While I agree that "the fact that a plan is substantially consummated . . . does not, by itself, render an appeal moot," *In re Mortgages Ltd.*, 771 F.3d 623, 629 (9th Cir. 2014) (internal quotation marks omitted), substantial consummation should be our "foremost consideration" in assessing equitable mootness, *see In re Continental Airlines*, 91 F.3d at 560. Indeed, as the majority acknowledges, many of our sister circuits have held that substantial consummation creates a *presumption* of equitable mootness. *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996); *Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.)*, 963 F.2d 469, 473 n.13 (1st Cir. 1992); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1149 (D.C. Cir. 1986). While we have not recognized such a presumption, nothing in our precedents suggests that we should not accord significant weight to substantial consummation in determining whether an equitable and effective remedy is available. *Cf. In re Mortgages*, 771 F.3d at 629 (recognizing that "[s]ubstantial consummation of a bankruptcy plan often brings with it a comprehensive change in circumstances that renders appellate review of the merits of the plan impractical," but that courts must still consider whether it is possible to "fashion effective relief").

I strongly disagree with the majority's conclusion that the equitable mootness doctrine is not meant to protect the interests of a third-party investor in SWVP's position. The majority concludes that we should not consider how the proposed remedies will affect SWVP's interests because SWVP participated in the bankruptcy proceedings, and this appeal. But we have never held that we may ignore a third-party investor's interests merely because the third party participated in the proceedings. The majority relies in part on the Fifth Circuit's decision in *Bank of New York Trust Co. v. Official Unsecured Creditors' Committee* (*In re Pacific Lumber Co.*), 584 F.3d 229 (5th Cir. 2009). However, that case involved a reorganization plan that had been crafted by a creditor and a competitor of the debtor. *Id*. at 238. It was therefore at least arguably fair to discount the creditor and competitor's interests in deciding whether the appeal was equitably moot, since they were responsible for the deficiencies in the plan. *Id*. There is no indication that SWVP had any connection to this case until the Debtors approached it to fund a reorganization plan the debtors had already crafted. In fact, a different third-party investor initially agreed to fund the plan. It was only after the first investor unexpectedly declined to pursue the transaction that SWVP agreed to make an investment on terms that were substantially similar to those the Debtors had previously negotiated with the other third-party investor. Once SWVP agreed to fund the plan, it was only natural that it would be involved in the bankruptcy proceedings, since its investment was the very reason the proposed reorganization was feasible. *See In re GWI PCS 1 Inc.*, 230 F.3d 788, 801–02 (5th Cir. 2000) (rejecting argument that "insiders" "lack[ed] good faith reliance on the reorganization plan," and noting that "it would be natural for many, if not a majority, of the transactions set

forth in a reorganization plan to involve the participants of the chapter 11 proceedings.").

The majority suggests that SWVP was not entitled to rely on the finality of the confirmation order because it could reasonably foresee that the order would be appealed. This argument unduly focuses on the reasonableness of SWVP's reliance, rather than on the compelling reasons why investors should be affirmatively *encouraged* to rely on the finality of confirmation orders. As the Third Circuit has observed,

> [o]ur inquiry should not be about the "reasonableness" of the Investors' reliance or the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.

*In re Continental Airlines*, 91 F.3d at 565. This case illustrates perfectly why encouraging reliance on bankruptcy confirmation orders is critical to facilitating complex reorganizations. Once a third party like SWVP invests to improve the debtors' capital, to the benefit of creditors and

debtors alike, it is much more difficult for it to walk away if the terms of its bargain are altered on appeal. The rule the majority endorses ignores the realities of the marketplace, and creates strong incentives for investors to delay funding improvements until after the appeal is completed, which may take years. It has already taken approximately three years since SWVP funded the plan in this case. Had SWVP waited to fund improvements, the Debtors' hotels would still be depreciating in value, and perhaps might even have been abandoned for want of funding. This would have negatively impacted the Lender by decreasing the value of its collateral and impeding, or terminating, the ability of the Debtors to generate cash flow and service their debt. Worse, the majority approach discourages third parties from agreeing to make these kinds of post-confirmation investments in the first instance. This is likely to detrimentally impact both creditors and debtors by decreasing the value of debtors' estates *ex ante* and making it more difficult to facilitate workable reorganizations. As the Seventh Circuit has eloquently observed:

> Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self-protection through the adjustment of prices may affect the viability of the reorganization, and in any event may distort the allocation of assets away from the persons who can make the most valuable uses of them and toward persons who are less sensitive to the costs of *ex post* changes of plans. By protecting the interests

> of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize *ex ante*, and thus produces benefits for creditors in the aggregate.

*In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994), *cert. denied*, 513 U.S. 999 (1994). Once this plan was confirmed, and once the Lender's request for a stay was denied, the very success of the reorganization depended on SWVP promptly funding improvements in reliance on the confirmation order. Reliance should be encouraged here, not discouraged.

There is another reason we absolutely must consider the impact the proposed remedies will have on SWVP. To determine whether this appeal is equitably moot, we must assess whether the remedies will "completely knock[] the props out from under the plan and thereby creat[e] an uncontrollable situation for the bankruptcy court." *Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d 869, 881 (9th Cir. 2012). Because the success of the entire reorganization plan hinges on SWVP's investment, answering this question requires us to predict whether SWVP will still consider this transaction attractive if the requested remedies are imposed.

There is ample reason to believe that incorporating the proposed remedies into the reorganization plan could cause SWVP to stop funding improvements and divest. The Lender suggests that "the bankruptcy court could compensate Lender for the value of its extinguished collateral by amending the Plan to provide a distribution to Lender equal to the approximately $30 million that SWVP paid for the new ownership interests in the reorganized Debtors." As the

majority acknowledges, for all practical purposes this would amount to a "distribution of money from SWVP to [the] Lender." The majority contends that the bankruptcy court can simply order SWVP to pay the Lender. But it is not that simple. SWVP was not a party to this bankruptcy, and there is no indication in the record that SWVP is obligated to invest in the Reorganized Debtors and continue to fund improvements if the plan is unwound. Therefore, if the confirmation order is vacated, the only thing keeping SWVP at the table will be its substantial sunk costs. The bankruptcy court could attempt to achieve a transfer from SWVP to the Lender indirectly by modifying the reorganization plan and hoping that SWVP's sunk costs deter it from divesting. But it is unlikely that SWVP will accept a plan that requires it to pay an extra $30 million, the amount of SWVP's investment under the original plan, to the Lender.

Nor is it likely that SWVP will view the other two proposed remedies any more favorably. The Lender suggests that "the bankruptcy court could replace Lender's collateral by providing Lender with a lien on the ownership interests in the reorganized Debtors." The Lender does not explain why SWVP would wish to continue to invest in renovating the properties of the reorganized Debtors if its ownership interest was suddenly subject to a lien. The other remedy the Lender proposes, full due-on-sale protections, would also fundamentally alter the economics of the transaction. SWVP's right to sell the hotels after five years was undoubtedly an essential feature of SWVP's bargain.

Even if the proposed remedies could be imposed on SWVP without jeopardizing its commitment to funding the improvements, it would not be equitable to do so. As the majority recognizes, we must address each of the Lender's

claims separately. The Lender's first claim is that the ten-year exception to the due-on-sale clause should be removed because it negated the Lender's § 1111(b) election. However, it does not appear that the original loan even contained a due-on-sale provision. Instead, the original loan permitted transfers of the properties on substantially similar terms as the ten-year exception to the due-on-sale clause contained in the reorganization plan. The Lender is therefore seeking greater protections than it had under the original loan. It would not be equitable to upset the plan at this juncture to provide protections that the Lender has no reasonable basis to expect.

The Lender's second claim is that the Mezzanine Debtors did not have any impaired class of creditors voting for the plan. The Lender acquired the mezzanine loan after the plan was proposed, knowing that the plan, if confirmed, would extinguish the mezzanine loan's collateral. That collateral was worthless, because it consisted of the Mezzanine Debtors' equity interest in the deeply insolvent Operating Debtors. Therefore, as the majority acknowledges, the mezzanine loan only had value because, according to the Lender's view of the law, it allowed the Lender to veto the plan.

The majority concludes that this issue is not equitably moot because the bankruptcy court can compensate the Lender for the loss of its veto right by, for instance, "requir[ing] SWVP to pay [the] Lender one dollar . . . ." We disagree about whether the bankruptcy court can require SWVP to pay the Lender directly. But even if it could, the availability of this relief would not justify upsetting the plan at this stage. It will generally be possible to award a nominal sum without wholly upsetting the economics of the plan. However, if this nominal remedy qualified as the "effective

and equitable relief" required by our equitable mootness cases, *see In re Thorpe*, 677 F.3d at 881, a remedy would always be available and no case would ever be equitably moot. The proper inquiry here is not only whether some nominal sum could be awarded, but whether it is prudent and fair at this juncture to vacate the confirmation order and jeopardize this reorganization.

I conclude that it is neither prudent nor fair. The majority would have us upset this successful reorganization for the sole purpose of vindicating the Lender's purported right to thwart a viable plan of reorganization, a right it strategically acquired on the eve of confirmation. This strongly conflicts with the Bankruptcy Code's purpose of promoting successful reorganization. *In re Continental Airlines*, 91 F.3d at 565. The public interest in promoting reliance on the finality of bankruptcy court confirmation orders, as well as basic fairness to SWVP, now greatly outweigh the Lender's interest in receiving compensation for its strategically acquired veto right.

I respectfully dissent.