PAEZ, Circuit Judge,
dissenting:
I do not agree with the majority that the bankruptcy court erred in its valuation of First Southern’s collateral under 11 U.S.C. § 506(a). In my view, a straightforward application of the Supreme Court’s decision in Associates Commercial Corporation v. Rash, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), compels valuing First Southern’s collateral — a 150-unit apartment complex — in light of Sunnys-lope’s proposed use of the property in its plan of reorganization as affordable housing. I therefore respectfully dissent from the majority’s holding that Sunnyslope’s proposed use of the property and the attendant restrictive covenants should not affect the value of First Southern’s secured claim.[1]
In reversing the bankruptcy court’s valuation ruling, the majority errs in several major respects, which all relate to its misapplication of the Supreme Court’s decision in Rash, the key case in this appeal. Therefore, I begin with a discussion of Rash and two lower-court opinions helpful in understanding its holding. I then address the errors that result from the majority’s misapplication of Rash. In the end, I would affirm the bankruptcy court’s order valuing First Southern’s collateral at $3.9 million.
I.
As the majority makes clear, First Southern’s secured claim must be valued according to section 506(a), which provides:
An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor’s interest in the estate’s interest in such property, ... and is an unsecured claim to the extent that the value of such creditor’s interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor’s interest.
11 U.S.C. § 506(a)(1).
A proper understanding of the Supreme Court’s interpretation of section 506(a) in Rash, and the majority’s erroneous application, begins with our decision in In re Taffi, 96 F.3d 1190 (9th Cir.1996) (en banc). In Taffi the IRS had attached a lien to the Taffis’ house to secure payment for a tax liability. Id. at 1191. The parties disputed the value of the IRS’s secured interest in the house. The Taffis advocated for a foreclosure value — that is, the amount the house would sell for under forced sale conditions. The IRS argued that the claim was worth whatever a willing and informed buyer would pay for the house under market conditions — what this court referred to as the “fair market value.” Although the bankruptcy court determined that the foreclosure value should apply, sitting en banc we disagreed. Id. at 1191-92.
*951 The en banc court answered the same question we confront here: “what is the appropriate method of valuation prescribed in a reorganization under Chapter 11 where collateral is retained by the debtors for the debtors’ use?” Id. at 1192. The court answered the question thus:
When a Chapter 11 debtor or a Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a)- is not to determine the amount the creditor would receive if it hypothetically had to foreclose and sell the collateral. Neither the foreclosure value nor the costs of repossession are to be considered because no foreclosure is intended. Instead, when the proposed use of the property is continued retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor’s continued possession—
In this case, the key fact is that the debtors are going to possess the House. This fact determines the disposition and use of the creditor’s interest. The foreclosure value is not relevant because no foreclosure is intended by the Plan. The Taffis are in, not outside of, bankruptcy. The IRS is not foreclosing. Valuation must be accomplished within the actual situation presented. Consequently, the value has to be the fair market value of what the debtors are using.
Id. In reversing the bankruptcy court and adopting a fair market value approach— “the price which a willing seller ... and a willing buyer ... would agree upon after the property has been exposed to the market for a reasonable time,” id. — the decision “put this circuit in harmony with all other circuits, except the Fifth, that have considered the question[.]” Id. at 1193.
The Fifth Circuit had reached the opposite conclusion in a case decided the same year. In In re Rash, 90 F.3d 1036 (5th Cir.1996) (en banc), the debtor also elected to retain the collateral, a tractor truck, securing the creditor’s lien in a Chapter 13 cramdown. The creditor argued that the truck’s value should be determined based on “what it would cost the debtors to purchase an identical vehicle,” that is, its replacement value. Id. at 1038. Both the bankruptcy court and the Fifth Circuit, sitting en banc, disagreed. Id.
The Fifth Circuit interpreted the text and structure of section 506(a) to militate against replacement value. The court determined that the first sentence of the statutory text required valuing “the creditor’s interest in the estate’s interest in” the secured property based on “the value of the collateral to the creditor.” Id. at 1044. The court also rejected the creditor’s argument that the bankruptcy court contravened the statute’s “proposed disposition or use” language in the second sentence by ignoring the Rashes’ proposed use of the truck and instead valuing it according to what the creditor would realize in a hypothetical disposition. Id. at 1047. The court disagreed that just “because the collateral is being retained and used by the debtor, its value is necessarily measured by its worth to the debtor.” Id. at 1047-48. The Fifth Circuit embraced the foreclosure value over a vigorous dissent, which argued that “Section 506(a) is not difficult to interpret. Read as a whole, it plainly means that when a reorganizing debtor retains and uses collateral, we must value the property according to its worth to the debtor (the actual user), not to the creditor (a purely hypothetical seller).” Id. at 1061 (Smith, J., dissenting).
The Supreme Court reversed. Rash, 520 U.S. at 959,117 S.Ct. 1879. Interpreting section 506(a), the Court held that the truck’s value was “the price a willing buyer in the debtor’s trade, business, or situation would pay to obtain like property from a willing seller.” Id. at 960, 117 S.Ct. 1879. *952 The Court referred to this as the “replacement value,” but explained that its use of that term was consistent with the Ninth Circuit’s understanding of the term “fair market value” in Taffi: “the price a willing buyer in the debtor’s trade, business, or situation would pay a willing seller to obtain property of like age and condition.” Id. at 959 n. 2, 117 S.Ct. 1879.
The Court began by expressly rejecting the Fifth Circuit’s “starting point” — what the creditor could realize in a foreclosure sale. Id. at 960-61, 117 S.Ct. 1879. The first sentence of section 506(a) contains no such requirement, the Court concluded. It instructs only that the secured portion of a creditor’s claim is limited to the value of the collateral; it says nothing of “how that interest is to be valued.” Id. at 961, 117 S.Ct. 1879 (emphasis in original). Instead, the second sentence’s “proposed disposition or use” language “is of paramount importance to the valuation question.” Id. at 962, 117 S.Ct. 1879. The Court concluded that the “disposition or use” of the collateral turns on the debtor’s alternative choice to surrender collateral or retain and use it pursuant to the cramdown provision, see 11 U.S.C. § 1325(a)(5), and that “[applying a foreclosure-value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor’s choice____” Bash, 520 U.S. at 962, 117 S.Ct. 1879. In contrast, using replacement value distinguishes between retention and surrender, “renders meaningful the key words ‘disposition or use,’ ” id., and “accurately gauges the debtor’s ‘use’ of the property ... in light of the proposed repayment plan reality[.]” Id. at 963, 117 S.Ct. 1879 (alterations and quotation marks omitted). Thus, the Court interpreted section 506(a) to require valuing property retained by a debt- or as “the cost the debtor would incur to obtain a like asset for the same ‘proposed ... use.’ ” Id. at 965, 117 S.Ct. 1879. On the facts presented in Rash, the debtor “elected to use the collateral to generate an income stream. That actual use, rather than a foreclosure sale that will not take place, is the proper guide — ” Id. at 963, 117 S.Ct. 1879; see also id. at 964, 117 S.Ct. 1879 (“Section 506(a) calls for the value the property possesses in light of the ‘disposition or use’ in fact ‘proposed,’ not the various disposition or uses that might have been proposed.”).
The Supreme Court’s instruction in Rash is plain, and its application straightforward. When a debtor retains collateral in a cramdown as in this case, its value turns on the debtor’s “actual use” of the collateral as proposed in the reorganization plan, id. at 963-64, 117 S.Ct. 1879 — not on a hypothetical foreclosure value. As a leading treatise explains,
The import of Rash is thus relatively clear: for purposes of determining the amount that must be paid to a secured creditor in the cramdown context, the question of value under section 506(a) turns on the value of the debtor’s proposed use of the relevant property under the plan, not the value achievable in a foreclosure scenario that is not proposed. This is the case even though the reorganization may ultimately fail and the creditor may foreclose on its collateral as a result.
2 Alan N. Resnick & Henry J. Sommer, Collier Bankr.Manual ¶ 506.02[6][a] (4th ed.2015); see also id. ¶ 506.02[7][d][I] (applying Rash to establish value in Chapter 11 cramdowns where the debtor retains the collateral). That valuéis measured by what the debtor would pay for a “like asset for the same ‘proposed ... use,’ ” Rash, 520 U.S. at 965, 117 S.Ct. 1879, or put differently, by “what a willing buyer in the debtor’s trade, business, or situation would pay to obtain like property[,]” id. at 960, 117 S.Ct. 1879.
*953 Here, Sunnyslope proposed in the reorganization plan to use the property to provide affordable housing, and in fact that was and remains the only permissible use of the property because of the restrictive covenants — unless and until post-confirmation default and foreclosure. “That actual use, rather than a foreclosure sale that will not take place, is the proper guide .... ” Id. at 963, 117 S.Ct. 1879. Because any willing buyer in Sunnyslope’s trade or business would take “like” property for the purpose of providing affordable housing and subject to similar restrictive covenants, the collateral’s value must be determined in light of the same purpose and burdens. See Taffi, 96 F.3d at 1192 (“Valuation must be accomplished within the actual situation presented. Consequently, the value has to be the fair market value of what the debtors are using.”). The bankruptcy court therefore did not err in valuing the property as affordable housing.
II.
A.
The foregoing discussion illuminates the majority’s errors. Critically, the majority begins from the same erroneous “starting point” as did the Fifth Circuit in its Rash en banc opinion, valuing the collateral from the creditor’s perspective. Indeed, the majority even borrows the same “starting point” language. Compare Maj. Op. 946 (“The starting point is that First Southern as a secured creditor stands in the first position---- First Southern’s secured claim is superior to the rights of other secured creditors.... If there were a foreclosure sale, there is no doubt that the restrictive provision would be swept away.”), with Rash, 90 F.3d at 1044 (de- . scribing the “logical starting point for valuation” as “what the creditor could realize if it sold the estate’s interest in the property according to the security agreement, taking into account the rights of other creditors with liens secured by the estate’s interest”), and Rash, 90 F.3d at 1051 n. 18 (reading section 506(a) to “suggest[ ] a valuation that starts with what the creditor could realize by repossession and sale of the collateral”).
But the Supreme Court expressly rejected starting the valuation from the creditor’s perspective. See Rash, 520 U.S. at 960-61, 117 S.Ct. 1879. Instead, the Court directed valuation from the debtor’s perspective. Id. at 963, 117 S.Ct. 1879 (“Of prime significance, the replacement-value standard accurately gauges the debt- or’s ‘use’ of the property.”); see also Taffi, 96 F.3d at 1192. The majority opinion ignores this directive, instead adopting the approach utilized by the Fifth Circuit in its en banc opinion and advocated by Justice Stevens’s dissent in Rash. See 520 U.S. at 966, 117 S.Ct. 1879 (Stevens., J., dissenting) (“[T]he value should be determined from the creditor’s perspective, i.e., what the collateral is worth, on the open market, in the creditor’s hands, rather than in the hands of another party.”).
B.
The majority’s erroneous focus on First Southern’s perspective stems from a concern that the bank got a raw deal in light of its senior position. At the outset of its analysis, the majority recognizes that no foreclosure sale occurred, yet nonetheless concludes, “But that does not mean that the secured value of First Southern’s secured claim may be suppressed by conditions subordinated to its position and attached to loans made by junior creditors.” Maj. Op. 946. Rash instructs, however, that the priority of First Southern’s secured claim with respect to other creditors simply has no place in an analysis that “turns on the value of the debtor’s proposed use of the relevant property under *954 the plan.” 2 Resnick & Sommer, Collier Bankr.Manual ¶ 506.02[6][a].
In any event, the majority’s concern is misplaced. First Southern purchased its interest knowing that covenants restricted the property’s use. When the bank purchased the rights of the senior lender from HUD, HUD expressly warranted in the loan sale agreement that First Southern would obtain “a valid and enforceable lien on the related Mortgaged Property having the lien priority indicated on the Mortgage Loan Schedule, except for ... (5) covenants, conditions and restrictions, rights of way, easements and other matters of public record[.]” (emphasis added). Although HUD released First Southern from the Regulatory Agreement, it did not purport to vitiate the other restrictive covenants requiring the property to be used as affordable housing. Those publicly recorded restrictions, which run -with the land, arose from agreements subordinate to the loan First Southern purchased and to the HUD Regulatory Agreement, but, in the absence of a foreclosure, still require Sunnyslope and its successors to operate the property as an affordable housing complex. Thus, when First Southern purchased the loan, it did so with knowledge of the restrictions, which likely had already “suppressed” the value of the security interest First Southern purchased: it bought an $8.5 million note for approximately $5 million.
C.
The majority’s two direct attempts to avoid the conclusion required by Rash are also unpersuasive. First, the majority concludes that the reference to “use” in Rash means simply the “alternative to ‘surrender’” rather than the “particular use to which the debtor elects to devote the property[.]” Maj. Op. 947. Thus, according to the majority, Rash does not compel looking to Sunnyslope’s particular use of the property as affordable housing. Maj. Op. 947-48 & n. 5. This is unpersuasive given the Supreme Court’s direction that the collateral must be valued from the debtor’s perspective and in light of the “economic benefit for the debtor derived from the collateral.” Rash, 520 U.S. at 963, 117 S.Ct. 1879. Ascertaining an “accurate [ ] gauge of the debtor’s ‘use’ of the property” requires determining present value with regard to how the debtor proposes to use the property — and any restrictions on the debtor’s use of the property — rather than focusing simply on the fact the debtor retains ownership. See id, (emphasis added). Indeed, in Rash the Supreme Court referred to the debtor’s use of the collateralized truck not generally but specifically “to generate an income stream” “in the freight-hauling business.” Id. at 957, 963, 117 S.Ct. 1879.
Even if the majority were correct that a section 506(a) valuation looks only to the fact of “use,” its methodology still contravenes the Supreme Court’s direction that replacement value should measure the cost to obtain similar property. Rash, 520 U.S. at 955, 117 S.Ct. 1879 (describing replacement value as “what the debtor would have to pay for comparable property”) (emphasis added); id. at 957, 117 S.Ct. 1879 (“the price the Rashes would have to pay to purchase a like vehicle”) (emphasis added); id. at 960, 117 S.Ct. 1879 (“the price a willing buyer in the debtor’s trade, business, or situation would pay to obtain like property from a willing seller”) (emphasis added); id. at 965, 117 S.Ct. 1879 (“the cost the debtor would incur to obtain a like asset for the same ‘proposed ... use’ ”) (emphasis added).
No willing buyer would purchase similar property for a price that does not reflect the restrictive covenants because, as discussed above, those covenants burden how future buyers could use the property. The most obvious evidence of this is that First Southern paid significantly less for the complex than it would have if the property *955 were not burdened by restrictive covenants. The majority is correct that the “cost to build or buy an apartment complex like Sunnyslope would be much more than the valuation ... allowed by the district court,” Maj. Op. 947, only if such a complex were not, in fact, like the Sunnys-lope complex, i.e., a 150-unit complex used to provide affordable housing and restricted to that use by covenants that run with the land.[2]
Second, the majority believes Rash should not apply because using the replacement-value standard provides First Southern with only one-third the value it would obtain in a foreclosure sale. Thus, the majority concludes, using the replacement-value standard here would disserve the policies motivating Rash — protecting the creditor from the “double risks” of a cramdown. Maj. Op. 947. Although the Supreme Court recognized that foreclosure value is “typically lower” than replacement value, 520 U.S. at 960, 117 S.Ct. 1879, it did not direct a different section 506(a) valuation in an atypical situation. Rather, its methodology is derived directly from the text of the statute: using foreclosure value (whether it be higher or lower than replacement value) would render superfluous the terms “disposition or use” and therefore is inappropriate. Id. at 962, 117 S.Ct. 1879.
Moreover, First Southern and the majority overstate the bank’s equities and need for protection. As noted above, First Southern purchased its loan from HUD at a discount price that presumably accounted for the risk of bankruptcy and the property’s limitations, both of which are expressly identified in the loan sale agreement. This distinguishes the bank from the “innocent” lender First Southern hypothesizes in its opening brief, that extends a mortgage to a farmer who subsequently grants a conservation easement over the land, depressing its value. First Southern purchased a lien on property worth less than its foreclosure value, for less than its foreclosure value; it cannot now be heard to complain that the bankruptcy court also valued it at less than foreclosure value.
# •!* *
The majority ignores Rash’s directive to value the collateral from the debtor’s perspective rather than from the creditor’s when the debtor elects to retain it. Unsurprisingly, this erroneous “starting point” leads to an erroneous ending point: although the majority purports to use a “replacement cost,” Maj, Op. 947-48, in essence it uses a hypothetical foreclosure method of valuation — assigning to the Sun-nyslope complex the same value that would obtain if First Southern foreclosed on the property and swept away the restrictive covenants. As a result, the majority contravenes the Supreme Court, and in doing so all but assures a post-confirmation default that will “have the negative effect of eliminating the use of the Sunnyslope project for affordable housing,” Maj. Op. 949. I respectfully dissent.[3]

. I agree with the majority that First Southern’s appeal is not equitably moot. See In re Transwest Resort Properties, Inc., 801 F.3d 1161, 1168 (9th Cir.2015).

. For this reason, the analogy the majority draws in footnote five is inapt. Even if a seller were not expected to sell property at a discount based on the buyer’s intended use, the seller would be expected to accept a discounted purchase price where, as here, the buyer's use of the property is limited by law. The correct valuation does not turn on any particular projected income stream, but on the fact that the economic benefit from the property is limited by Sunnyslope’s proposed use and the restrictive covenants.

. As a result of the majority's ruling, Sunnys-lope's cross-appeal is moot and the appeal and cross-appeal in No. 13-1614 are also moot. Under these circumstances, there is no *956 need to address the issues raised in those separate appeals.