**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE CITY OF STOCKTON, CALIFORNIA, *Debtor*, | No. 14-17269 D.C. No. 12-32118 |
| MICHAEL A. COBB, *Objector-Appellant*, v. CITY OF STOCKTON, *Debtor-Appellee.* | OPINION |

Appeal from the United States Bankruptcy Court
for the Eastern District of California
Christopher M. Klein, Chief Bankruptcy Judge, Presiding

Argued and Submitted November 14, 2016
Resubmitted December 10, 2018
San Francisco, California

Filed December 10, 2018

Before:  Sidney R. Thomas, Chief Judge, and Ronald M.
Gould and Michelle T. Friedland, Circuit Judges.[*]

Opinion by Chief Judge Thomas;
Dissent by Judge Friedland

**SUMMARY**[**]

**Bankruptcy**

The panel dismissed as equitably moot an appeal from
the bankruptcy court's order denying an objection to
confirmation of the Chapter 9 plan of adjustment of the City
of Stockton.

The objector had filed an inverse condemnation claim
against the City in state court.  The plan classified the claim
as a general unsecured claim.

Agreeing with the Sixth Circuit, the panel dismissed the
appeal as equitably moot because the objector did not seek a
stay of confirmation; the plan had been substantially
consummated; the relief of undoing plan confirmation would
bear unduly on innocent third parties; and the bankruptcy

---

[*] This case was originally submitted to a panel that included Judge
Kozinski. After Judge Kozinski's retirement, Judge Gould was drawn by
lot to replace him.  Ninth Circuit General Order 3.2.h.  Judge Gould has
read the briefs, reviewed the record, and listened to oral argument.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

court could not fashion relief without undoing the confirmed plan.

The panel also affirmed the bankruptcy court's conclusion that the objector's claim—that the Takings Clause exempted his unsecured claim from reorganization—failed on the merits. The panel concluded that the objector's purported property interest was, in reality, a claim for monetary relief.

Dissenting, Judge Friedland wrote that the objector sought only to have his claim for just compensation under the Takings Clause excepted from discharge, and a claim that falls outside of bankruptcy cannot be subject to the bankruptcy doctrine of equitable mootness. On the merits, Judge Friedland wrote that because the objector maintained a constitutional claim for just compensation, and because that claim should have been excepted from discharge, the state-court inverse condemnation action should have been allowed to proceed.

---

## COUNSEL

Bradford J. Dozier (argued), Atherton & Dozier, Stockton, California, for Objector-Appellant.

Robert Loeb (argued), Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Christopher J. Cariello, Orrick Herrington & Sutcliffe LLP, New York, New York; Lesley M. Durmann, Patrick B. Bocash, and Marc A. Levinson, Orrick Herrington & Sutcliffe LLP, Sacramento, California; for Debtor-Appellee.

---

**OPINION**

THOMAS, Chief Judge:

Michael Cobb appeals the bankruptcy court's order denying his objection to confirmation of a Chapter 9. However, he did not seek a stay of confirmation at any stage; the plan has been substantially consummated; the relief of undoing plan confirmation would bear unduly on innocent third parties; and the bankruptcy court could not fashion relief without undoing the confirmed plan. Therefore, we dismiss his appeal as equitably moot. His claims also fail on the merits.

I

A

When it filed its Chapter 9 petition, Stockton became the largest city in history to seek municipal bankruptcy protection. The recession had reduced property values by half, and 22% of Stockton's residents were unemployed. *Franklin High Yield Tax-Free Income Fund v. City of Stockton* (*In re City of Stockton*), 542 B.R. 261, 265 (B.A.P. 9th Cir. 2015). The City was unable to pay bondholders, it had over-committed to public pensions, and its accounting system was in disarray. *Id.* Budget cuts left police able to respond only to emergency calls. *Id.* at 266, 274. Stockton ranked 10th in the nation in its violent crime rate, with homicides at an all-time record. *In re City of Stockton*, 493 B.R. 772, 780 (Bankr. E.D. Cal. 2013). In a cost-cutting initiative commenced in 2008, the City workforce decreased by 25%. *Id.* The police force was reduced by 20%; the fire

department's workforce by 30%; and the public works employee workforce by 38%. *Id.*

Despite these cost-cutting measures, the City projected a general fund deficit of almost $9 million as of June 2012 and a deficit of $20 to $30 million in the next fiscal year. *Id.*; *Franklin*, 542 B.R. at 266. The City Council authorized diversion of money from earmarked funds and intentionally defaulted on payments for over $2 million of bonds. *In re City of Stockton*, 493 B.R. at 781, 789. It also authorized a neutral evaluation process under California Government Code § 53760, a prerequisite to a Chapter 9 bankruptcy filing. *Franklin*, 542 B.R. at 266.

Unlike other voluntary bankruptcy petitioners, a Chapter 9 debtor must prove that it is eligible for bankruptcy relief. 11 U.S.C. §§ 109(c), 921(c). One of the statutory requirements is that the debtor must prove that it is insolvent. 11 U.S.C. § 109(c)(3). Here, the City filed a petition for an Order for Relief alleging that it was eligible for bankruptcy and, in fact, was insolvent. After a three-day bench trial, the bankruptcy court issued an extensive order making factual findings and determining that the City was eligible for Chapter 9 relief. As to insolvency, the court examined the City's ability to: (1) pay its debts as they matured (commonly referred to as "cash insolvency"); (2) pay for the costs of providing services required for the health, safety, and welfare of the community (commonly called "service delivery insolvency"); and (3) create a balanced budget (termed "budget insolvency"). After considering the evidence, the court found that:

> The sum of the evidence establishes that the
> City was insolvent by all available measures

when it filed its chapter 9 case. It was cash insolvent, unable to pay its debts as they came due as required by § 101(32)(C) and § 109(c)(3). That it was service delivery insolvent confirms that the cash insolvency was not a mere technical insolvency. That it was budget insolvent for the long term confirms that the insolvency would persist without realignment of revenues and expenses. Hence, the City satisfied the insolvency requirement of § 109(c)(3).

*In re City of Stockton*, 493 B.R. at 790–91.

The ensuing Chapter 9 proceedings were complex, costly, and contentious. *Franklin*, 542 B.R. at 266. Pre-petition settlements were reached with a number of creditors, and collective bargaining agreements were renegotiated. *Id.* Under the guidance of a court-appointed mediator, post-petition settlements were reached with the California Public Employees' Retirement System; the Stockton Police Officers' Association; the Official Committee of Retirees; Assured Guaranty Corporation (which insured the City's pension bonds); the National Public Finance Guarantee Corporation (an insurer of almost $100 million in city bonds); Ambac Assurance Corporation (an insurer of $13.3 million in City certificates of participation); and Wells Fargo Bank (indenture trustee for a number of the City's bond issues). *Id.* at 266–67. Eventually, over the objections of some creditors, including Cobb, Stockton's plan of reorganization was confirmed. *Id.* at 268.

The plan was funded by "a sales tax increase in the greatest amount and for the longest period permitted by

California law." *Id.* at 271 (citation omitted). Under the plan, City employees and retirees "shared the pain" with the capital market and bond creditors, losing the pension and lifetime health benefits around which they had planned their futures. *Id.* (citation omitted). The plan provided for payment of $1.5 billion in claims distributed among 20 classes of creditors.

The plan became effective in February 2015. *Id.* at 276. Pursuant to the plan, the City made wire transfers totaling $13.1 million, including a settlement of heath care benefits to retirees and payments to institutional creditors. The City implemented the provisions of the plan, restructuring its obligations to two other major institutional creditors by conveying title to 17 parking lots and garages, assigning leasehold interests, and assigning an option for the purchase of a city office building. The City has continued to make its payments pursuant to the plan, with secured creditors receiving lower payments on the secured debt and unsecured creditors receiving lesser amounts.

B

So, what was Objector-Appellant Michael Cobb's part in all of this? The background is somewhat procedurally complex. Cobb's father, Andrew Cobb, owned a parcel of land in Stockton. In 1998, the Stockton City Council resolved that the public necessity required the condemnation of a strip of land across the parcel for the purpose of building a road.

In California, the power of eminent domain can be exercised through traditional condemnation proceedings, where possession is taken at the time of judgment, or through

"quick-take" condemnation where a locality can take possession upon depositing a probable compensation amount determined by a qualified expert appraiser. Cal. Const. art. I, § 19; Cal. Civ. Proc. Code § 1255.010; *see also Mt. San Jacinto Cmty. Coll. Dist. v. Superior Court of Riverside Cty.*, 151 P.3d 1166, 1168 (Cal. 2007). Following the deposit of funds under the "quick-take" procedure, the government may move the court for an immediate possession order. Cal. Civ. Proc. Code § 1255.410. If the defendant elects to withdraw the proposed compensation amount, he waives all claims and defenses to the condemnation, except a claim for greater compensation. Cal. Civ. Proc. Code § 1255.260.

Stockton elected to use the "quick-take" process. Thus, pursuant to California Civil Procedure Code § 1255.010, the City had an expert appraise the parcel to determine the amount of just compensation owed to Andrew Cobb. The appraiser valued the parcel at $90,200.00. As required by the "quick-take" provisions, the City deposited that sum with the California State Treasurer Condemnation Deposits Fund. That same day, the City initiated eminent domain proceedings in the Superior Court of California, County of San Joaquin, to acquire a permanent easement over the parcel (the "eminent domain action").

Later that year, the Superior Court determined the City had met the requirements of § 1255.010, concluded it had met the requirements of probable compensation, and issued an Order for Prejudgment Possession in favor of the City. A road was then built on the parcel, and the Stockton City Council passed a resolution in 2000 accepting the improvements.

In the meantime, Andrew Cobb passed away and his son, Michael Cobb, inherited the parcel. After Andrew Cobb's death, Cobb was substituted in the condemnation action. He entered into a stipulation with the City allowing him to withdraw the deposited amount and, in 2000, he withdrew the entire amount of the deposit. At that point, by operation of law, he waived all of his defenses and claims to the property, except a claim for greater compensation. Cal. Civ. Proc. Code § 1255.260. In other words, Cobb gave up all rights to the property. He did not assert a counterclaim for greater compensation in the condemnation proceeding.

Seven years later, Cobb attempted to return the $90,200.00 to the City—apparently in an attempt to revoke his earlier waiver—but the City would not accept the funds, explaining that the withdrawal of probable compensation was final under California law. Cobb deposited the funds into an interest-bearing trust account.

In 2007, the Superior Court dismissed the City's eminent domain action because it had not been brought to trial within five years of its commencement, as is required by California Civil Procedure Code § 583.310. A year later, Cobb filed a complaint in San Joaquin County Superior Court, seeking relief for inverse condemnation (the "inverse condemnation action"). The complaint alleged that because the City failed to prosecute the eminent domain action, the true market value of the parcel remained undetermined and thus Cobb had not received the just compensation due him under the California Constitution. Over the next several months, Cobb amended his complaint three times, adding claims for quiet title, ejectment, trespass, and declaratory relief. The City demurred to all the amended complaints. The Superior Court sustained the City's demurrer as to the inverse condemnation

claim on the grounds that it was barred by the statute of limitations because the taking occurred more than five years before the complaint was filed, and it sustained the City's demurrer as to the other claims on the grounds that they were barred by the doctrine of intervening public use.

Cobb appealed the Superior Court's dismissal of his inverse condemnation claim solely on statute of limitations grounds. He did not appeal the dismissal of the quiet title, ejectment, trespass, or declaratory relief claims. In 2011, the Court of Appeals reversed the dismissal of Cobb's inverse condemnation claim, finding that his claim was timely because it "did not accrue until the City's occupation of the property became wrongful, which did not occur until the eminent domain proceeding was dismissed." Thus, what remained of his state court action was simply an unliquidated and unsecured monetary damage claim. The merits of his inverse condemnation claim remain unadjudicated and unproven. As the bankruptcy court pointed out, given the various defenses available to the City, "Mr. Cobb has a very steep hill to climb in his action for greater compensation in the California courts."

Thereafter, in 2012, the City petitioned for bankruptcy protection under Chapter 9. In a Chapter 9 bankruptcy, the debtor is not required to file schedules and a statement of financial affairs. Rather, the debtor is required to file a list of creditors. 11 U.S.C. § 924. Any claim on the debtor's list is deemed filed as a proof of claim pursuant to 11 U.S.C. § 501, unless the debt is listed as contingent, disputed or unliquidated. 11 U.S.C. § 925.

When it filed its list of creditors in this case, the City identified Cobb's claim as an unsecured, disputed liability

claim of an unknown amount. Subsequently, Cobb filed a proof of claim for $4,200,997.26. Cobb's claim consisted of a principal of $1,540,000.00 for the parcel, $2,282,997.26 in interest on the principal, $350,000.00 in attorney's fees and expenses, $13,000.00 in costs of suit, and $15,000.00 in real estate taxes and maintenance and insurance costs. Cobb did not assert on his proof of claim that his claim was secured.

In 2013, the City filed its first amended plan for adjustment of its debts (the "plan"), which listed 19 classes of claims. The plan included Cobb's claim in Class 12 as a general unsecured claim. On February 11, 2014, Cobb filed an objection to confirmation of the plan, alleging that his "claims in inverse condemnation are protected by the Fifth and Fourteenth Amendments to the United States Constitution and cannot be impaired by the Plan." He did not contest the listing of his claim as unsecured.

In 2014, the bankruptcy judge overruled Cobb's objection to confirmation of the pending plan of adjustment. The bankruptcy judge explained that Cobb is left with only a claim for more money because the road had long since been built on the parcel and because by withdrawing the probable just compensation, Cobb had waived by operation of law all claims except a claim for greater compensation. In an oral ruling, the bankruptcy judge concluded that "[t]he bankruptcy clause does permit the adjustment of a debt for greater compensation," and "if [the debt] were reduced to judgment, it would be a general unsecured debt at the moment the judgment was issued."

Cobb did not seek a stay of plan confirmation from the bankruptcy court. Cobb timely appealed the bankruptcy court's order overruling his objection to the plan to the

district court for the Eastern District of California. He did not seek a stay of plan confirmation before the district court.

Cobb and the City both stipulated, pursuant to 28 U.S.C. § 158(d)(2)(A), that the appeal warranted proceeding directly to the Court of Appeals for the Ninth Circuit. On August 7, 2014, the district court certified this appeal to this Court, pursuant to 28 U.S.C. § 158(d)(2)(B)(ii). A motions panel of our Court granted Cobb's motion to appeal directly to this Court. Cobb did not seek a stay of plan confirmation. The bankruptcy court confirmed the City's plan of adjustment and issued a final judgment. Cobb did not seek a stay following plan confirmation, and the plan became effective on February 25, 2015.

## II

### A

Finality is essential to the success of bankruptcy reorganization plans. A reorganization plan almost always involves tradeoffs, debt adjustment, partial asset liquidation, and the infusion of new revenue sources. Both creditors and the debtor require certainty so that the debtor can return to economic health, and the creditors can maximize their recovery within the debtor's ability to pay. In the case of a municipal reorganization, the public has an enormous stake in the outcome so that critical government programs, such as law enforcement, fire protection, and public works, can be restored. Thus, if a creditor wishes to challenge a reorganization plan on appeal, we require the creditor to seek a stay of proceedings before the bankruptcy court. When a stay is requested, all affected parties are on notice that the plan may be subject to appellate review and have an

opportunity to present evidence before the bankruptcy court of the consequences of a stay. "A confirmed reorganization plan operates as a final judgment with *res judicata* effect." *Unsecured Creditors Comm. v. Southmark Corp.* (*In re Robert L. Helms Constr. & Dev. Co.*), 139 F.3d 702, 704 (9th Cir. 1998) (en banc).

If the creditor does not seek a stay, then the creditor risks dismissal of the appeal on the grounds of equitable mootness. "An appeal is equitably moot if the case presents transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc.* (*In re Transwest Resort Props., Inc.*), 801 F.3d 1161, 1167 (9th Cir. 2015) (quoting *Rev Op Grp. v. ML Manager LLC* (*In re Mortgs. Ltd.*), 771 F.3d 1211, 1215 (9th Cir. 2014)). If there is a confirmed bankruptcy plan that deserves finality—for employees, retirees, creditors, taxpayers, and for the future of the City—it is Stockton's.

B

We have identified four factors to determine whether an appeal is equitably moot, namely: (1) whether a stay was sought; (2) whether the plan has been substantially consummated; (3) the effect of the remedy on third parties not before the court; and (4) "whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court." *In re Transwest Resort Props., Inc.*, 801 F.3d at 1167–68 (quoting *Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d 869, 881 (9th Cir. 2012)).

1

As to the first factor, there is no doubt. Cobb sought no stay whatsoever. He did not seek a stay in the bankruptcy court. He did not seek a stay in the district court. He did not seek a stay in our Court. While he was appealing the rejection of his plan objections, he took no action to stay the plan's implementation, although confirmation proceedings were ongoing. He did nothing.

It is "obligatory" that one seeking relief from plan confirmation "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *Trone v. Roberts Farms, Inc.* (*In re Roberts Farms, Inc.*), 652 F.2d 793, 798 (9th Cir. 1981). Failure to do so without adequate explanation should result in dismissal. *Id.* Seeking a stay affords the bankruptcy court the opportunity to consider equitable factors, make a reasoned decision, and provide a decision and record which an appellate court can review. On the other hand, excusing a failure to seek a stay before the bankruptcy court allows a party to play possum, without consequence, while everyone else has materially changed positions in reliance on plan confirmation. The first factor indisputably favors application of equitable mootness.[1]

2

The second factor is whether the plan has been substantially consummated, and Cobb does not contest the

---

[1] In *Franklin*, in which the Bankruptcy Appellate Panel dismissed an appeal in this bankruptcy as equitably moot, the creditor had a much better argument than Cobb because it had actually sought a stay in bankruptcy court. *Franklin*, 542 B.R. at 275.

fact that it was. As the Bankruptcy Appellate Panel noted, there is no dispute that this plan was substantially consummated in February 2015. *Franklin*, 542 B.R. at 276. The City wired payment to institutional creditors, transferred property, and sent checks to former city employees to resolve pension claims. *Id.* It conveyed title to numerous parcels of real property, assigned leasehold interests, and granted purchase options. The City has now operated under the reorganization plan for years. The second factor also favors application of equitable mootness.

3

The third factor is "whether the relief sought would bear unduly on innocent third parties." *In re Transwest Resort Props., Inc.*, 801 F.3d at 1169. In other words, it must be "possible to [alter the plan] in a way that does not affect third party interests to such an extent that the change is inequitable." *Id.* (quoting *In re Thorpe Insulation Co.*, 677 F.3d at 882) (alteration in original).

Here, reversal of the Confirmation Order would undermine the settlements negotiated with the unions, pension plan participants and retirees, bond creditors, and capital market creditors, all of which were built into the reorganization plan. As the Bankruptcy Appellate Panel concluded in *Franklin*, "[t]o reverse the Confirmation Order at this point would have a potentially devastating impact on creditor constituencies whose settlements with the City were incorporated in the Plan and who are not appearing before us in this appeal." *Franklin*, 542 B.R. at 278.

In addition to the creditors, reversal of the Confirmation Order would have a substantial effect on the citizens of

Stockton, who depend upon the City for the provision of vital services. The City placed ample evidence in the record of the serious impact of reversal of plan confirmation, which impact is confirmed in *Franklin*.

Cobb argues that his claim is only a monetary one, having little impact on creditors or the City. Leaving aside the fact that the remedy he seeks is to reverse plan confirmation, Cobb is making a multi-million dollar claim which, on its face, would have a considerable impact on the City. He suggests, without proof, that the City has the resources to pay the claim. However, as the City pointed out in *Franklin*, allowing such a claim would likely result in revisiting the City's Long Range Financial Plan, which provided the basis for the plan's feasibility, and "consequently calling into question the economic underpinnings of the Plan." 542 B.R. at 276 (internal quotation marks and citation omitted).

In addition, and most importantly, the only adjudication of the City's solvency in the record is the bankruptcy court's findings of facts and conclusions of law holding that the City was insolvent—a finding that was adopted and reiterated at the time of plan confirmation.[2] Cobb did not challenge the City's claim of insolvency in the bankruptcy court, nor dispute the bankruptcy court's findings. He simply suggests

---

[2] Further, even if Cobb could demonstrate the City's ability to fund the claim, the solvent-debtor exception to the stay requirement does not apply where, as here, there has "been such a comprehensive change in circumstances as to render it inequitable for the court to consider the merits of the appeal." *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002). This rule makes good sense, as "[b]ankruptcy cases often implicate parties besides the debtor and its creditors." *In re Mortgs. Ltd.*, 771 F.3d at 1216.

for the first time on appeal, without support in the record, that the City is not insolvent.

In sum, the third factor favors application of equitable mootness.

4

The final factor is whether the bankruptcy court could fashion equitable relief without completely undoing the plan. Of course, undoing the plan is precisely the remedy that Cobb seeks. Cobb argues that he seeks only monetary relief, but his appeal is of the bankruptcy court's order overruling Cobb's objection to confirmation of the plan of adjustment. His challenge—and his only challenge—is to the confirmation of the plan itself. In his objection to the plan before the bankruptcy court, Cobb argued that the plan could not be confirmed, and "[w]here a Chapter 9 Plan may not be confirmed, the remedy appears to be dismissal of the bankruptcy case." The Notice of Appeal was taken as to the bankruptcy court's order denying his objection to plan confirmation. On appeal, he reiterated his objection to the plan and repeated his claim that where a bankruptcy plan cannot be confirmed, the remedy is dismissal of the bankruptcy case.

Sustaining Cobb's objection would mean dismantling the confirmed reorganization plan, which is the only relief he seeks. Considering this remedy in *Franklin*, the Bankruptcy Appellate Panel concluded that "[r]eversing the Confirmation Order would 'knock the props out from under' the plan and would leave the bankruptcy court with an unmanageable situation on remand." *Franklin*, 542 B.R. at 278. The plan provides for 20 different classes of creditors, almost all of

which have been deemed impaired—meaning that the legal, equitable, or contractual rights of the creditors are affected by the plan. Plan confirmation adjusted all of these rights. To reverse the Confirmation Order at this stage would create chaos and undo years of carefully negotiated settlements. The fourth factor favors application of equitable mootness.

5

Thus, as it was for the Sixth Circuit in considering a similar appeal arising out of Detroit's bankruptcy, "[t]his is not a close call." *Ochadleus v. City of Detroit* (*In re City of Detroit*), 838 F.3d 792, 799 (6th Cir. 2016). As with the situation posed by the Detroit municipal reorganization, the complex plan has been confirmed, affecting the rights of thousands of creditors and the public.

The reorganization train has left the station. Cobb did not pursue any bankruptcy stay remedies, much less pursue them with the requisite diligence. The plan has long been substantially consummated. He offers too little, too late. None of the factors that we consider in deciding whether to apply the doctrine of equitable mootness favor Cobb. Thus, his appeal must be dismissed.

III

Cobb's underlying theory—that the Takings Clause exempts his unsecured claim from reorganization—is not viable on this record, and the bankruptcy court properly concluded that this claim fails on the merits. The Takings Clause is only implicated in bankruptcy if the creditor has actual property rights. In other words, the creditor must have an "*in rem* right under nonbankruptcy law to look to specific

items of property" in order for the debt to be paid ahead of unsecured creditors. 4 *Collier on Bankruptcy* ¶ 506.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017). If the purported property interest is, in reality, just a contractual or statutory right for monetary relief, then the debt can be adjusted in bankruptcy.

## A

Distilled to its essence, Cobb's argument on appeal is that he has a property interest that cannot be adjusted in bankruptcy. But that is not what his bankruptcy claim is, or even what he asserted that his was. As we have noted, both the City and Cobb classified his claim as an unsecured monetary claim. Cobb has never challenged the categorization of the claim as unsecured; nor has he sought, through 11 U.S.C. § 506 or otherwise, to have his interest adjudicated otherwise. Indeed, prior state court judgments against him would have precluded that.

Even assuming that Cobb had asserted a property-based proof of claim, it failed on the merits to be categorized as such, as the bankruptcy court found. First, he had relinquished his property interest in the land more than 15 years before bankruptcy was filed. As we have noted, under California's "quick-take" condemnation proceedings, Stockton properly hired a qualified expert appraiser, who valued the property. Following the statutory procedure, Stockton then deposited the funds and moved the superior court for immediate possession of the property, and the superior court granted the City immediate possession of the parcel. Andrew Cobb did not object to the probable just compensation finding or judgment.

As we have noted, under California law, if the property owner elects to withdraw the proposed compensation amount, he waives all claims and defenses to the condemnation, except a claim for greater compensation. Cal. Civ. Proc. Code § 1255.260. Michael Cobb withdrew the deposit, thereby waiving all claims, except as to a claim for greater compensation. In other words, Cobb gave up all rights to the property. He did not assert a counterclaim for greater compensation in the condemnation proceeding.

Seven years later, he tried to return the money, which the City declined. His subsequent suit against the City, in which he sought quiet title and declaratory relief, among other remedies, was dismissed. In sum, the relief he sought to enforce property rights or restoration of his property interest was rejected. That judgment is final and binding. He did not take an appeal from that decision, except as to the statute of limitations on his inverse condemnation claim. The California Court of Appeal granted him relief on that question. So, what remains of his state court action is simply an unliquidated and unsecured monetary damage claim.

Thus, the bankruptcy court properly concluded that once Cobb withdrew the tendered compensation, he waived by operation of law all claims and defenses in his favor as to the property, except for a claim for greater compensation, which is an unsecured monetary debt claim.

Second, Cobb independently relinquished any property interest he had by allowing the City to construct the road and open the road to public use. Under California law, if a property owner allows the government to complete the taking of the property for public use, he is "denied the right to enjoin the agency." *Frustuck v. City of Fairfax*, 28 Cal. Rptr. 357,

373 (Cal. Dist. Ct. App. 1963). The fact that formal title has not passed is irrelevant under California law. *California ex rel. Dep't of Pub. Works v. Peninsula Title Guar. Co.*, 301 P.2d 1, 3 (Cal. 1956) (noting that when there has been a prior physical taking the subsequent title transfer "is merely a confirmation of the original taking").

Thus, when the bankruptcy was filed, Cobb did not possess a right to the property protected by the Fifth Amendment. It had been extinguished. What remained was bare legal title—without any other property rights and subject to defeasance by the prior litigation—and an unsecured statutory monetary claim for greater compensation.

Cobb's theory seems to be that an unliquidated, statutory claim for greater compensation cannot be adjusted in bankruptcy. But it is purely a monetary claim. As the bankruptcy court pointed out, if the inverse condemnation claim had been reduced to a judgment, it would be subject to adjustment in bankruptcy; therefore, it is not logical to say that an unliquidated claim for greater compensation cannot be adjusted in bankruptcy.

Nor does the character of any claim asserting an unconstitutional taking make it immune from evaluation on the merits in bankruptcy. Indeed, we have approved the dismissal of a takings claim in its entirety by a bankruptcy court. *George v. City of Morro Bay (In re George)*, 322 F.3d 586, 590–91 (9th Cir. 2003) (per curiam). Cobb cannot implicate the Takings Clause in order to elevate his claim above other Fifth Amendment-protected property interests—which are adjustable in bankruptcy—and to escape procedural requirements. *See Bennett v. Jefferson Cty.*, __ F.3d __, 2018 WL 3892979, at *7 (11th Cir. 2018) (quoting

*Henderson v. United States*, 568 U.S. 266, 271 (2013)) ("[T]he mere fact that a potential or actual violation of a constitutional right exists does not generally excuse a party's failure to comply with procedural rules for assertion of the right. A 'constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'").

Cobb had ample opportunities in the bankruptcy court to adjudicate the nature of his claim through a variety of procedural mechanisms. He did not do so. He listed his claim as unsecured and did not file any proceeding to have the court determine its secured status. He did not object to the disclosure statement. He did not seek exemption from discharge. It would be improper not only to excuse all of these failures, but to invent for him an entirely new remedy on appeal. One cannot play possum during bankruptcy proceedings and then claim some new interest after a plan has been confirmed. A contrary holding would emasculate bankruptcy proceedings.

B

Cobb argues that his monetary claim has protected status because it was originally founded as a constitutional claim. However, other constitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy—and, in fact, were adjusted in this bankruptcy. Cobb cites *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935), for the unremarkable proposition that the bankruptcy power is subject to the Fifth Amendment. However, that "does not mean, of course, that secured creditors are immune from the bankruptcy process."

4 *Collier on Bankruptcy* ¶ 506.02.  Rather, "in a number of contexts the Code expressly permits the adjustment of debts of secured creditors, including lien rights."  *Id.*

Moreover, as the Supreme Court itself suggested in *Helvering v. Griffiths*, 318 U.S. 371, 400–01 & n.52 (1943), the precedential weight of *Radford* is uncertain in light of *Wright v. Vinton Branch*, 300 U.S. 440 (1937), in which the Court upheld the same act struck down in *Radford* following relatively minor amendment.  Indeed, the relevant problem addressed in *Radford* is "the taking of substantive rights in specific property acquired by the bank *prior* to the act." *Radford*, 295 U.S. at 590 (emphasis added).  This reading of *Radford* presents an easy synthesis with *United States v. Security Industrial Bank*, in which the Court held that constitutional infirmity could be avoided by reading a bankruptcy statute as not compromising security interests created before the statute was enacted.  459 U.S. 70, 81 (1982).  The Supreme Court has never held that the Takings Clause renders claims that accrued after the Bankruptcy Code was enacted immune from the Bankruptcy power, or the bankruptcy process.[3]  In short, *Radford* does not reach as far as Cobb asserts.

Further, "just compensation" under the Takings Clause is not equivalent to "full compensation."  *United States v. Norwood*, 602 F.3d 830, 834 (7th Cir. 2010).  The concept of "just compensation" requires consideration of "all circumstances," including whether the contemplated

---

[3] *See, e.g.*, James Steven Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause*, 96 HARV. L. REV. 973, 974 (1983).

compensation "would result in manifest injustice to owner or public." *United States v. Commodities Trading Corp*, 339 U.S. 121, 123 (1950) ("[T]he dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?").

In sum, when Stockton filed its bankruptcy petition, Cobb did not possess a property interest cognizable as such in bankruptcy, and he never asserted anything but an unsecured proof of claim. His unsecured claim for greater compensation was not tethered to the actual property interest he had when the bankruptcy was filed. Rather, his claim is for the purported rights that were extinguished long before the bankruptcy was filed. What he is left with after bankruptcy is bare property title and an unliquidated unsecured claim. Given the circumstances of the case, the bankruptcy court correctly determined that Cobb's claim was properly categorized in the reorganization plan and properly overruled his objection to plan confirmation.

## IV

Stockton's reorganization plan was confirmed and has been substantially consummated. Undoing the confirmed plan would seriously affect the rights of third parties. Cobb did not take the minimal step of seeking a stay at any level—not before the bankruptcy court, not before the district court, and not before us. On the merits, the bankruptcy court properly rejected his claim. The claim was correctly categorized as unsecured and adjusted as such.

This appeal is not the first time that the question of equitable mootness has arisen in the context of this

bankruptcy. In *Franklin*, the Bankruptcy Appellate Panel carefully reviewed the challenge of a large capital market creditor to Stockton's plan of reorganization. It concluded that the creditor's challenge was equitably moot in consideration of the substantial consummation of the plan, the effect on third parties, and whether relief could be fashioned without destroying the plan. *Franklin*, 542 B.R. at 264–65. The same considerations apply here, with the same effect.

**DISMISSED.**

---

FRIEDLAND, Circuit Judge, dissenting:

The Bill of Rights constrains the powers given to Congress by Article I of the Constitution. And, in particular, the Fifth Amendment's requirement that the government provide just compensation for any taking of private property constrains the powers granted to Congress by the Bankruptcy Clause of Article I. Takings claims should therefore be excepted from discharge in bankruptcy.

The majority contends that the judge-made bankruptcy doctrine of equitable mootness is the dominant principle at issue in this appeal, and that it prevents us from even adjudicating the constitutional claim to just compensation asserted by Appellant Michael Cobb ("Cobb") against the City of Stockton ("City"). But equitable mootness has no role to play here. Cobb seeks only to have his claim to just compensation excepted from discharge—that is, to effectively be treated as falling outside the City's bankruptcy adjustment plan ("Plan"). A claim that falls outside of bankruptcy cannot be subject to the bankruptcy doctrine of equitable mootness.

I would therefore reach the merits of Cobb's appeal rather than dismissing it.

As to the merits, there is no dispute that the City condemned Cobb's property.**[1]**  And, after that happened, Cobb took all actions necessary under state law to preserve his right to just compensation for the taking of that property. Indeed, his state court action for just compensation would have proceeded if it had not been stayed in response to the City's bankruptcy filing.  Because Cobb maintains a constitutional claim for just compensation, and because that claim should have been excepted from discharge, I would hold that Cobb's state-court inverse condemnation action should be allowed to proceed.

## I.

The majority concludes that any appeal seeking to unravel the Plan would be equitably moot.  Even assuming so, undoing the confirmed Plan is not on the table in this appeal. Cobb has been abundantly clear before our court that he seeks only to except his claim from discharge, and thus to remove his claim from the Plan altogether.  Although Cobb originally lodged his complaint as an objection to the Plan, which may

---

**[1]** I note that the fee owner of the parcel is the Andrew C. Cobb 1992 Revocable Trust dated July 16, 1992, for which Cobb serves as trustee. In that capacity, Cobb has the authority to "prosecute or defend actions, claims, or proceedings for the protection of trust property."  *Moeller v. Superior Court*, 947 P.2d 279, 284 (Cal. 1997) (quoting Cal. Prob. Code § 16249).  In such actions, "the trustee, rather than the trust, is the real party in interest."  *Id.* at 283 n.3.  I accordingly refer to Cobb as the "owner" of the condemned parcel, and the parties have similarly stipulated that Cobb became the "owner of the [p]arcel by operation of state probate and trust succession following the death of [his father,] Andrew C. Cobb."

have seemed to him the only option given the novelty of the legal issue his situation presented, he has since plainly disclaimed any intent to "unwind" the Plan. Equitable mootness considerations are therefore irrelevant here and should not prevent us from adjudicating Cobb's argument that his takings claim was entitled to "pass through [the] bankruptcy unaffected." *In re Towers*, 162 F.3d 952, 953 (7th Cir. 1998).

Equitable mootness "reflects an *unwillingness* to provide relief" in cases involving bankruptcy "transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *In re Transwest*, 801 F.3d 1161, 1167 (9th Cir. 2015) (quoting *In re Mortgs. Ltd.*, 771 F.3d 1211, 1215 (9th Cir. 2014)). I am unaware of any case in which we have applied an equitable mootness analysis to an individual's claim that an asset should have been excepted from discharge and excluded from bankruptcy proceedings altogether. Indeed, it makes no sense to extend this judicially created doctrine to cases like this one. The sole point of this appeal is that Cobb should have been permitted to pursue his claim outside of the Plan because his claim should have been excepted from discharge. *See In re Towers*, 162 F.3d at 953. Such an appeal could never undo a plan. If an appellant like Cobb prevails, his or her claim will survive totally apart from the plan, and recognition of such survival will in no way change the terms of the plan. If the appellant does not prevail, then it will have been appropriate to have discharged his or her claim as part

of the plan, and there will thus be no reason to change the terms of the plan.**[2]**

The majority relies on *Franklin High Yield Tax-Free Income Fund v. City of Stockton*, 542 B.R. 261, 265 (B.A.P. 9th Cir. 2015), to conclude that we should dismiss this appeal because Cobb's claim might jeopardize the City's financial health. In fact, the Bankruptcy Appellate Panel in *Franklin* recognized that a claim solely for a monetary remedy—unlike a claim seeking to undo the Plan—would not necessitate disturbing the Plan and so would not be moot. *Id.* at 277. As a result, the Bankruptcy Appellate Panel concluded that "to the extent [the creditor] s[ought] through its appeal [from confirmation of the Plan] only a greater payment on its unsecured claim . . . an effective remedy [was] theoretically possible, and that claim [was] not equitably moot." *Id.* at

---

**[2]** And with respect to the first equitable mootness factor—whether a stay was sought—it would be pointless for parties trying to have their claims excepted from discharge to be required to seek to stay a plan that they believe their claims should not be part of in the first place. Moreover, although Cobb did not seek a stay of the Plan, he was certainly diligent in pursuing his rights. *See In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012) (holding that "where a party has done nothing by its own inaction to encourage or permit developments to proceed without its participation, courts should be cautious about reaching a conclusion of equitable mootness"). Cobb argued in the bankruptcy court that his "claims in inverse condemnation are protected by the Fifth and Fourteenth Amendments to the United States Constitution and cannot be impaired by the Plan," and the bankruptcy court held a hearing and then ruled on this objection. As a result, contrary to the majority's suggestion, it was unnecessary for Cobb to seek a stay to afford the bankruptcy court an opportunity to rule on this issue.

278.**[3]** *Franklin* thus did not, as the majority suggests, hold that requiring the City to pay a monetary judgment would threaten the integrity of the Plan.

Because this appeal in no way threatens the finality of the Plan, and in fact seeks to allow Cobb's claim to proceed totally apart from the Plan, I would fulfill our "virtually unflagging obligation . . . to exercise the jurisdiction given" us by ruling on the merits. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

## II.

With respect to the substance of Cobb's claim, the majority is persuaded that Cobb has waived all property rights in the condemned parcel as a matter of California law, including his right to seek just compensation. And, even if he has not, the majority appears to conclude that a claim for just compensation could be reduced in bankruptcy. I disagree on both counts. Starting with the latter point, as a matter of constitutional first principles, I believe municipalities are obligated to provide just compensation for any taking of private property, regardless of the bankruptcy laws. And regarding Cobb's claim in particular, I believe that Cobb has preserved a constitutional claim for just compensation, and

---

**[3]** And because Cobb, unlike the creditor in *Franklin*, seeks to proceed entirely outside the Plan, the City would be under no obligation to compensate him within the same timeframe in which it compensates the creditors covered by the Plan. *See infra* note 14.

that his claim thus should have been excepted from discharge.[4]

## A.

"Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action," including "the relevant limitations of the Bill of Rights." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). Where, for example, a statute violates the First Amendment, it is no answer that the statute was properly enacted pursuant to Congress's power under the Commerce Clause. *See Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 77 (1974) (noting that Congress "is of course subject to the strictures of the Bill of Rights, and may not transgress those strictures" when enacting legislation). Accordingly, although Congress has the authority to enact "uniform Laws on the subject of Bankruptcies," U.S. Const. art. I, § 8, cl. 4, such laws must not take away rights guaranteed by the Bill of Rights. These rights include the Fifth Amendment's proscription, operational against the states under the Fourteenth Amendment, that private property shall not "be taken for public use, without just compensation," U.S. Const. amend. V. *See Dolan v. City of Tigard*, 512 U.S. 374, 383–84 (1994).

---

[4] I recognize that only a portion of the proof of claim that Cobb submitted in the bankruptcy proceeding is truly a claim for just compensation, and I would hold that Cobb's claim should be excepted from discharge only to the extent that it seeks just compensation for the condemned parcel in excess of what he has already been paid. I do not believe that Cobb is entitled to shield from bankruptcy the portion of his claim that requests other forms of recovery, such as attorney's fees or insurance costs.

In addressing the interplay between these clauses of the Constitution, the Supreme Court has confirmed that the Takings Clause of the Fifth Amendment constrains the power conferred by the Bankruptcy Clause of Article I. The Court first discussed this principle in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). *Radford* held that the Frazier-Lemke Act, which effectively permitted a debtor to purchase mortgaged property for less than its fair market value, was unconstitutional. The Court explained that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Id.* at 589. As a result, the Act's impairment of a mortgagee's rights violated the Takings Clause:

> [T]he Fifth Amendment commands that, however great the Nation's need, private property shall not be . . . taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain.

*Id.* at 602. In short, *Radford* teaches that the Takings Clause prohibits the impairment in bankruptcy of "substantive rights in specific property," such as the rights of a mortgagee in real property.[5] *Id.* at 590.

---

[5] The Supreme Court later upheld the constitutionality of the amended Frazier-Lemke Act in *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937). Contrary to the majority's assertion, *Wright* does not undermine the Court's holding in *Radford* that the bankruptcy power is subject to the Takings Clause. Rather, *Wright* turned on the

Similarly, in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974), the Court expressed concern that a bankruptcy statute might unconstitutionally leave a taking uncompensated, though it concluded that a mechanism existed to provide just compensation, alleviating that concern. *Id.* at 149, 155. Those cases involved a challenge to the constitutionality of the Regional Rail Reorganization Act, under which railroad creditors would receive securities of then-unknown value to compensate them for the conveyance of the railroads' property. *Id.* at 117–18. The Court recognized that the reorganization "might raise serious constitutional questions" absent a method to challenge the amount of compensation received, because the properties were to be transferred before it was clear whether the securities would satisfy the requirement of just compensation. *Id.* at 149, 155. But because the creditors had "recourse to a Tucker Act suit in the Court of Claims for a cash award to cover any constitutional shortfall," the Court held that the reorganization provided "adequate assurance that any taking w[ould] be compensated." *Id.* at 155.

The Court subsequently reconfirmed in *United States v. Security Industrial Bank*, 459 U.S. 70 (1982), that "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without just compensation." *Id.* at 75. There, the Court considered a

---

determination that the new Act had no significant impact on property rights at all. 300 U.S. at 457, 470; *see also Rodrock v. Sec. Indus. Bank*, 642 F.2d 1193, 1197–98 (10th Cir. 1981) (explaining that while subsequent cases "may well refine the rule of *Radford*, . . . they do not destroy the fundamental teaching of *Radford* that Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property previously acquired by a creditor"), *aff'd sub nom. United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982).

Takings Clause challenge to the Bankruptcy Code exemption in 11 U.S.C. § 522(f)(2), which permits individual debtors to avoid liens on certain personal property, such as household goods or appliances, in bankruptcy proceedings. *Id.* at 71–73. Holders of non-purchase-money, non-possessory liens on such property argued that retroactive application of § 522(f) to their liens would exact a taking. *Id.* at 73. The Court agreed that retroactive application of the statute would raise serious constitutional questions, because the provision "could be read literally to divest property interests which had been created before it was enacted." *Id.* at 80. Emphasizing "'the absence of a clear expression of Congress' intent to' apply" the provision to preexisting liens, the Court invoked the doctrine of constitutional avoidance to hold that the statute did not apply retroactively, thus averting the possibility that § 522(f) might result in a taking. *Id.* at 78–82 (quoting *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 507 (1979)).[6]

---

[6] The majority attempts to limit this line of cases to situations in which the government retroactively divests creditors of their property interests. But, even if it should be so limited, that is exactly the situation facing Cobb. To begin, there is no question that a taking occurred that divested Cobb of his interest in real property. He had an undisputed right to just compensation until the City filed for bankruptcy and attempted to eliminate that right retroactively.

Moreover, the majority fails to recognize the important distinction between the rights of land owners and the rights of secured creditors. Applying § 522(f) prospectively in *Security Industrial Bank* did not implicate constitutional concerns because the property interests of secured creditors are themselves "defined by reference to existing law." *See* James Steven Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause*, 96 Harv. L. Rev. 973, 987 (1983). When a creditor "enter[s] into [a] security arrangement, he kn[ows] . . . that his rights [a]re circumscribed by the federal legislation." *Id.* By contrast, legislation restricting rights in real property could never be entirely

These decisions underscore that Congress's bankruptcy powers do not allow it to infringe upon rights guaranteed by the Takings Clause. Where a taking has occurred, just compensation is owed and cannot be reduced—bankruptcy notwithstanding. Accordingly, a municipality may not nullify its obligation to pay just compensation for seized property through a chapter 9 proceeding. Rather, claims for just compensation should be excepted from discharge, such that they survive any bankruptcy intact.[7]

## B.

Unlike the majority, I believe Cobb took all the steps necessary to preserve his constitutional claim for just compensation. When Cobb's property was condemned by the

---

prospective. *Id.* at 987 n.59. In other words, "there can . . . be new security arrangements," but there "can be no new land." *Id.* Accordingly, Cobb's claim implicates the same concerns that led the Supreme Court to limit retroactive application of the bankruptcy laws.

[7] I note that the majority's contrary approach is at odds with the only other federal court that has addressed this question. The bankruptcy court adjudicating Detroit's municipal bankruptcy held that the Takings Clause prohibits the discharge in bankruptcy of pending claims for just compensation arising from already completed takings. *In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014). There, creditors were slated to receive a fraction of their takings claim under Detroit's chapter 9 plan. *Id.* at 267. Because the proposed plan denied those creditors their constitutionally owed just compensation, the court held that it would violate the Fifth Amendment if confirmed. *Id.* at 270. The bankruptcy court thus provided in its confirmation order that the takings claims were excepted from discharge. *Id.*

City, he obtained a constitutional right to just compensation.**[8]** He retained this right by filing an inverse condemnation action and pursuing it in accordance with the appropriate state procedures. That action is still pending in state court, having been stayed when the City filed its bankruptcy petition. As a result, Cobb maintains a claim for just compensation that should now be allowed to proceed.

The majority instead holds that Cobb has forfeited all property rights in the condemned parcel under California law, and that his pending claim is "simply" a statutory claim for monetary damages. But the statutory character of Cobb's

---

**[8]** This case presents a separate issue from cases adjudicating whether a taking has in fact occurred. The majority cites *In re George*, 322 F.3d 586 (9th Cir. 2003), for the proposition that we have approved a bankruptcy court's dismissal of a takings claim on the merits. There, we considered the application of 11 U.S.C. § 365(d)(4), which requires a bankruptcy trustee to assume or reject an "unexpired lease of nonresidential real property" within a particular timeframe to avoid having to surrender the property. 322 F.3d at 589 n.2 (quoting 11 U.S.C. § 365(d)(4)). We had previously clarified that, because the statute allows the debtor either to assume or to reject the lease, the statute does not itself result in an unconstitutional taking. *See In re Ariz. Appetito's Stores, Inc.*, 893 F.2d 216, 220 (9th Cir. 1990) (explaining that where a debtor does not move to assume a lease, it is the debtor's "own conduct" that results "in the rejection of the lease and the loss of its interest in the building"—not operation of the bankruptcy statute). In *In re George*, the debtors were required to surrender the leased property after they failed to take action during the relevant timeframe. 322 F.3d at 589. We concluded that there was no cognizable taking because, following the surrender, "the debtors ha[d] no valid right to possess or develop the property." *Id.* at 590. Accordingly, the debtors had "no right to be compensated at all, let alone justly." *Id.* at 591. Contrary to the majority's characterization, there was therefore no colorable takings claim for the bankruptcy court to have any impact on one way or the other. Here, by contrast, there is no question that a taking occurred that entitled Cobb to compensation.

claim does not diminish its constitutionally protected
status—indeed, a constitutional claim for just compensation
*is* a statutory claim for monetary damages under California
law.

And Cobb did not forfeit his right to just compensation by
either withdrawing the probable just compensation funds or
permitting the public to use the road. The California
Supreme Court has in fact explained that the constitutionality
of the state's quick-take scheme rests in part on its allowing
a continuing claim for greater compensation after deposited
funds are withdrawn. *Cf. Mt. San Jacinto Cmty. Coll. Dist. v.
Superior Court*, 151 P.3d 1166, 1175 (Cal. 2007). I thus
disagree that Cobb has completely relinquished his interest in
the property.

**1.**

The majority's conclusion that Cobb's inverse
condemnation action somehow became untethered from the
Takings Clause is both inconsistent with California law and
fundamentally at odds with the Fifth Amendment. To
demonstrate why this is so, it is necessary to describe the
constitutional nature of Cobb's pending inverse
condemnation action under California law.

Because the Fifth Amendment "proscribes takings *without
just compensation*, no constitutional violation occurs until
just compensation has been denied." *Williamson Cty. Reg'l
Planning Comm'n v. Hamilton Bank of Johnson City*,
473 U.S. 172, 194 n.13 (1985). The Fifth Amendment does
not require payment of just compensation "in advance of, or
contemporaneously with, the taking; all that is required is that
a 'reasonable, certain and adequate provision for obtaining

compensation' exist at the time of the taking." *Id.* at 194 (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. at 124–25). Accordingly, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195.

California provides such a process by making available an action for inverse condemnation. *See Regency Outdoor Advert., Inc. v. City of Los Angeles*, 139 P.3d 119, 123 (Cal. 2006) ("Inverse condemnation actions provide a vehicle for property owners to obtain 'just compensation.'"); *Adam Bros. Farming v. Cty. of Santa Barbara*, 604 F.3d 1142, 1147–48 (9th Cir. 2010) (noting that the procedure for seeking just compensation in California is an inverse condemnation action). An inverse condemnation action enables a property owner to enforce his constitutional right to just compensation, *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 868 (Cal. 1985), when a municipality "has taken private property for public use without following the requisite condemnation procedures," *Customer Co. v. City of Sacramento*, 895 P.2d 900, 905 (Cal. 1995).

An inverse condemnation action became available to Cobb when the City failed to prosecute its eminent domain action to final judgment and thus did not complete the condemnation procedures required under California law to compensate Cobb and to secure title for the City.**[9]** *See Redev.*

---

**[9]** To the extent the majority faults Cobb for not asserting a counterclaim for greater compensation in the eminent domain proceeding, the majority is mistaken. Because an eminent domain action will necessarily determine the compensation due to the property

*Agency v. Gilmore*, 700 P.2d 794, 802 (Cal. 1985) (explaining that title to condemned property does not pass until a final order of condemnation has been recorded, including in a quick-take case); *accord* Cal. Civ. Proc. Code § 1268.030(c). The majority misunderstands the significance under state law of Cobb's retention of title. Where, as here, a municipality takes possession of property using the quick-take process, title to the property does not vest in the municipality until there has been a jury determination of just compensation, the full amount of that compensation has been paid, a final judgment has been entered in the eminent domain action, and a final order of condemnation has been recorded. Cal. Const. Art. 1, § 19; Cal. Civ. Proc. Code § 1268.030(a), (c). Because the City failed to pursue its eminent domain claim to completion, no jury determination of just compensation

owner—indeed, that is the purpose of the action—a property owner is not required to separately counterclaim for more than the probable just compensation funds. In fact, the value of the probable just compensation funds "may not be given in evidence or referred to in the trial of the issue of compensation" during an eminent domain proceeding in California court. Cal. Civ. Proc. Code § 1255.060(a). This state procedural rule would make no sense if a property owner had to bring a counterclaim to request compensation in excess of the deposited funds. Moreover, the City has never asserted that Cobb was required to bring a counterclaim for his requested compensation. Even assuming such a requirement existed, then, the City has forfeited any argument that Cobb failed to meet it. Finally, as the California Court of Appeal explained in concluding that Cobb's inverse condemnation action was still timely, a property owner is not required to bring an inverse condemnation action until the dismissal of the eminent domain proceeding. If Cobb had been required to assert a counterclaim for greater compensation, he would not have had a viable inverse condemnation claim that could even potentially have been time barred. The fact that the Court of Appeal held that Cobb's inverse condemnation action could proceed shows that the court implicitly concluded that Cobb was not required to bring a counterclaim in the eminent domain action.

occurred, Cobb's takings claim was never finally adjudicated, and title to his property never passed to the City. *See Redev. Agency*, 700 P.2d at 802; *Prop. Reserve, Inc. v. Superior Court*, 375 P.3d 887, 907–08 (Cal. 2016) (observing that, under California law, condemnation requires "a jury determination of just compensation"). As a result, although the majority is correct that Cobb could not now eject users of the road from the land, Cobb's title is meaningful because it demonstrates that he has an outstanding constitutional claim for just compensation. *See id.*

Cobb's efforts to pursue that claim were halted when the City's bankruptcy filing led to a stay of Cobb's inverse condemnation proceeding. To this day, Cobb remains the legal owner of the property with an outstanding claim for just compensation.[10]

---

[10] *People ex rel. Department of Public Works v. Peninsula Title Guaranty Co.*, 301 P.2d 1 (Cal. 1956), is not to the contrary. The majority invokes *Peninsula Title* for the proposition that formal title passage is not required to effect a change of ownership "[w]here there has been a prior physical 'taking.'" *Id.* at 3. But the question in *Peninsula Title* was whether a property owner who retains legal title remains liable for certain taxes after a public entity has already taken the property. *Id.* at 3–4. The California Supreme Court held that, under those circumstances, lack of a formal transfer of title should not operate to impose continued tax liability on a property owner who has already experienced "a divestiture for all practical purposes." *Id.* at 3. The issue in *Peninsula Title* was thus whether a property owner should continue to bear the *burdens* of ownership throughout the lengthy eminent domain process despite having effectively lost the property, not whether a property owner is deprived of the only *benefit* remaining to him at that point—the constitutional right to seek just compensation. The City has not cited any cases that support the latter proposition, nor has the majority. And, indeed, Cobb has continued to pay taxes on the parcel.

### 2.

The majority recasts Cobb's effort to enforce his constitutional right to just compensation as a mere monetary claim that is based on California's statutory scheme rather than the United States Constitution. As a preliminary matter, of course Cobb's claim takes the form of a statutory claim for money. The Fifth Amendment requires that states provide a mechanism for compensating land owners for their condemned property, so such takings claims will generally be brought in accordance with procedures laid out in state statutes. Takings claims arising in California do not somehow lose their constitutional status merely because California's procedures for seeking just compensation were codified by statute rather than solely through caselaw. And all actions for just compensation could be characterized as claims for money; that is the nature of the claim. *Cf. Lucree v. United States*, 117 Fed. Cl. 750, 752 (2014) ("A claim for just compensation [under federal law] is a claim for money damages cognizable under the Tucker Act.").[11] The fact that Cobb's claim takes the form of a statutory claim for money damages, therefore, does not render it something other than a claim for just compensation arising out of the Fifth Amendment.

Additionally, Cobb's claim for just compensation did not lose its constitutional mooring when Cobb withdrew the

---

[11] For these reasons, and contrary to the majority's assertion, Cobb's inverse condemnation claim should have been exempted from discharge even if it had already been reduced to judgment. Whether someone has an outstanding claim for just compensation or a judgment awarding him just compensation, he has a constitutional right to just compensation that neither a city nor Congress through its bankruptcy powers may extinguish.

probable just compensation funds.  Cobb undeniably waived certain rights by withdrawing the funds, including his ability to challenge the City's "right to take" and "any claim as to lack of a public purpose."  *See Clayton v. Superior Court*, 78 Cal. Rptr. 2d 750, 752 (Ct. App. 1998).  But the plain language of California Civil Procedure Code § 1255.260 preserves Cobb's right as the owner of the property to seek "greater compensation."

And try as the majority might to reframe a claim for "greater compensation" as some monetary claim unrelated to the property owner's constitutional right to just compensation for taken property, the California Supreme Court has equated a claim for greater compensation following a quick take procedure with the constitutional right to just compensation. *See Mt. San Jacinto Cmty. Coll. Dist.*, 151 P.3d at 1175 (rejecting a party's argument that California's quick-take procedures deprive property owners of their constitutional right to just compensation on the ground that "section 1255.260 does not require waiving a claim for greater compensation with withdrawal of the deposit").  Under California law, a claim for "greater compensation" comprises Cobb's ability "to litigate the issue of adequate compensation," *Clayton*, 78 Cal. Rptr. at 753, that is, the "amount of 'just compensation' to which [he] [i]s entitled," *Contra Costa Water Dist. v. Vaquero Farms, Inc.*, 68 Cal. Rptr. 2d 272, 274–75 (Ct. App. 1997) (rejecting the argument that a condemnee waived the ability to argue that just compensation had not yet been paid by withdrawing the probable just compensation deposit under section 1255.260). The amount of just compensation is precisely the matter at issue in Cobb's inverse condemnation action.

Nor did Cobb relinquish his interest in just compensation by, as the majority puts it, "allowing the City to construct a road and open it to public use."[12]  In support of the contention that he did, the majority cites *Frustuck v. City of Fairfax*, 28 Cal. Rptr. 357 (Ct. App. 1963), which held that "where a property owner permits the completion by a . . . public agency of the work which results in the taking of private property for a public use he will be denied the right to enjoin the agency." *Id.* at 373.  But *Frustuck* speaks to a landowner's *right to enjoin*, not his ability to seek just compensation, and thus has no applicability here. *See id.*  Indeed, the very next sentence of *Frustuck* following the passage quoted by the majority states: "[The property owner's] only remedy under such circumstances is a proceeding in inverse condemnation to recover damages." *Id.  Frustuck* thus does not stand for the proposition that intervening public use deprives a condemnee of *all* property rights.  *Frustuck* merely clarifies that, instead of injunctive relief, the appropriate remedy in such circumstances is to seek just compensation in an inverse condemnation action—the very course Cobb pursued.[13]

---

**[12]** I note that the Cobb family permitted the City to build a road only in the sense that they did not challenge the City's action for prejudgment possession.  *See* Cal. Civ. Proc. Code § 1255.410(c).  The Cobbs did not otherwise have a choice as to whether the City could proceed with construction.

**[13]** It is irrelevant that Cobb did not appeal the Superior Court's rejection of his quiet title, ejectment, and trespass claims.  Those claims seek relief that would essentially prohibit the City from continuing to use the land for a public road; such relief is no longer available to Cobb, *see Frustuck*, 28 Cal Rptr. at 373, and the Superior Court accordingly held that the doctrine of intervening public use barred those claims.  But *Frustuck* makes clear that Cobb can still pursue just compensation in an inverse condemnation action, *see id.*, and he appealed the Superior Court's dismissal of that claim.

Accordingly, Cobb has not relinquished his right to seek just compensation under California law. Cobb's right to just compensation arose when the City seized his property for public use nearly 20 years ago, and he has adequately pursued that right ever since.

**3.**

Finally, the majority places great weight on Cobb's failure to contest the unsecured classification of his claim within the Plan. But the Constitution's mandate that takings claims be excepted from discharge does not depend on whether those claims were initially classified in any bankruptcy proceeding as secured or unsecured; the whole point of nondischargeability is that nondischargeable claims pass through bankruptcy unaffected, *see In re Grynberg*, 986 F.2d 367, 370 (10th Cir. 1993). And the Bankruptcy Code does not require a creditor with a claim that is excepted from discharge to file a proof of claim in the bankruptcy proceeding to preserve that claim in its entirety. *Id.* (describing how a "holder of a nondischargeable debt" is "free to pursue the debtor outside bankruptcy"); *see also In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991) (recognizing that if a creditor with a nondischargeable claim "elected not to participate in the bankruptcy case and not to file a claim, the debtor would remain burdened by that debt following bankruptcy").[14] Instead, the Federal Rules of Bankruptcy

---

[14] Of course, where a creditor with a nondischargeable claim elects to sit out the bankruptcy entirely, the creditor loses the opportunity to participate in voting on or distribution under the plan. *Grynberg*, 986 F.2d at 370; *see also* Fed. R. Bankr. P. 3003(c)(2) (explaining that a creditor who does not file a proof of claim in a chapter 9 or chapter 11 proceeding "shall not be treated as a creditor with respect to such claim *for the purposes of voting and distribution*" (emphasis added)). And "[c]reditors

Procedure plainly state that a complaint seeking exception from discharge "may be filed at any time."[15]  Fed. R. Bankr. P. 4007(b).  As a result, the classification of Cobb's claim within the Plan is irrelevant here.

Moreover, while Cobb may not have challenged his claim's specific classification, he unequivocally maintained throughout the bankruptcy proceeding that his claim for just compensation was "protected by the Fifth and Fourteenth Amendments to the United States Constitution and c[ould not] be impaired by the Plan" or treated as a mere "'general unsecured' claim."  This line of reasoning plainly encompasses the argument that his claim should have been excepted from discharge.  Cobb has now also clearly expressed to our court that the remedy he requests is to preserve his takings claim.  Given that the parties had an opportunity to address all of the relevant issues, I see no reason to fault Cobb for failing to challenge the categorization of his claim as unsecured.  After all, "the bankruptcy law is not supposed to function merely as a procedural gauntlet that only the most adroit or best represented creditors can overcome." *Kolstad*, 928 F.2d at 173.

---

holding nondischargeable debts who do not participate in the distribution of the debtor's estate under the plan take a large risk that the debtor will have nothing left after bankruptcy proceedings are concluded, and that although the debt has not been discharged, meaningful recovery will be postponed indefinitely." *Grynberg*, 986 F.2d at 370 n.4.

[15] The only exception to the lack of a time limit—not applicable here—is for complaints filed under 11 U.S.C. § 523(c), which relates to debt incurred from fraud or willful and malicious injury. *In re Coleman*, 560 F.3d 1000, 1004 n.6 (9th Cir. 2009); *see also* 11 U.S.C. § 523(a)(3)(B).

## III.

Contrary to the majority's suggestions, the sky will not fall if Cobb is allowed to pursue his claim for just compensation. I am not blind to the City's herculean task of pulling itself out of bankruptcy, but a ruling for Cobb would not topple the Plan, or somehow throw the City back into bankruptcy. The City has presented no evidence that Cobb cannot be compensated for his condemned property while the City carries out its Plan. The City has not, for example, argued that it would have to claw back distributions under the Plan to pay Cobb. Indeed, the City has not even claimed that it is currently insolvent.[16] And, because Cobb seeks to proceed entirely outside of the Plan, the City would be under no obligation to compensate him within the same timeframe in which it compensates creditors under the Plan. *See supra* note 14.

In addition, as the majority itself notes, just compensation does not necessarily mean full compensation. *United States*

---

[16] To argue otherwise, the majority relies on facts from the Bankruptcy Appellate Panel's decision in a different challenge to the City's bankruptcy, *Franklin High Yield Tax-Free Income Fund v. City of Stockton*, 542 B.R. 261 (B.A.P. 9th Cir. 2015). There is no basis for incorporating statements—absent from the record here—that were made in a separate litigation in which Cobb was not a party. *See United States v. Joyce*, 511 F.2d 1127, 1132 (9th Cir. 1974) (explaining that "the facts found in one case are not evidence of those same facts in another case"). That the majority found it necessary to do so demonstrates the lack of evidence presented on the issue in *this* appeal. And, in fact, the bankruptcy court in the *Franklin* proceeding noted that with the City's "finances on more stable footing," it was possible that "additional funds could be made available to [creditors] . . . and that could be done without disturbing in any way the payments to retirees." *Franklin*, 542 B.R. at 277.

*v. Norwood*, 602 F.3d 830, 834 (7th Cir. 2010).  I agree with the majority that a determination of just compensation requires considering whether the compensation "would result in manifest injustice to owner or public."  *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950).  But the analysis of what just compensation entails must take place under the Fifth Amendment, rather than through the lens of the Bankruptcy Code.

Moreover, recognizing the protected nature of Cobb's claim would have implications only for other takings claims, and thus would not leave the City vulnerable to a slew of new liabilities arising from other sorts of constitutional claims.  The import of Cobb's claim is not merely that he has a constitutional right—it is that he has a constitutional right *to just compensation*.[17]  The Takings Clause stands alone among constitutional provisions in requiring a specific compensatory remedy.  By contrast, nothing in the Constitution expressly guarantees compensation for a violation by a city of, for example, the Equal Protection Clause of the Fourteenth Amendment.  *See In re City of Detroit*, 524 B.R. 147, 265 (Bankr. E.D. Mich. 2014) (concluding that, in contrast to the Takings Clause, "the Fourteenth Amendment does not provide a substantive constitutional right to compensation for damages").   The majority's observation that other constitutional claims are routinely reduced during bankruptcy proceedings misses this crucial distinction.

---

[17] Because of this distinction, the majority's reliance on *Bennett v. Jefferson Cty.*, 899 F.3d 1240 (11th Cir. 2018), is unwarranted.  In *Bennett*, the Eleventh Circuit held that equitable mootness may bar consideration on appeal of constitutional challenges to a chapter 9 plan, but the challenges the court considered related to voting rights and procedural due process, not the Takings Clause.  *Id.* at 1243, 1250–51.

**IV.**

For the foregoing reasons, I respectfully but adamantly dissent.